**LAWRENCE NAT. BANK v. RICE et al.** *

No. 1254.

Circuit Court of Appeals, Tenth Circuit.

Feb. 10, 1936.

LEWIS, Circuit Judge, dissenting.

———◆———

Justin D. Bowersock, of Kansas City, Mo. (Robert B. Fizzell and John F. Rhodes, both of Kansas City, Mo., on the brief), for appellant.

Raymond F. Rice, of Lawrence, Kan., for appellees.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

PHILLIPS, Circuit Judge.

The Watkins Bank and the Lawrence Bank had been engaged in the general banking business at Lawrence, Kansas, for many years prior to October 20, 1928. For some time prior to that date the Watkins Bank had been desirous of discontinuing the banking business and arranging for the payment of its deposit liabilities in full upon demand without sacrificing its non-liquid assets. The Lawrence Bank was desirous of securing as many as possible, of the accounts of the Watkins Bank when the latter discontinued business.

On October 20, 1928, the banks entered into a contract wherein the Watkins Bank was referred to as First Party, and the Lawrence Bank as Second Party. The material portions of the contract read as follows:

"That whereas, the Board of Directors and shareholders owning more than two-thirds of the capital stock of First Party have expressed, by resolutions duly adopted, * * * authority for all of the liabilities to creditors to be trans-

*For opinion on rehearing, see 83 F.(2d) 642.

ferred to and assumed by Second Party. * * *

"That whereas, the Second Party is willing to assume and pay all of the liabilities hereinafter set forth of First Party to its creditors, * * *.

"Now, therefore, * * * it is hereby mutually agreed by and between them as follows:

"1. First Party shall cause to be prepared a statement of its condition as of the close of business on October 20, 1928, showing in detail its resources and liabilities as of said date as appearing on the general ledger or daily statement of First Party, * * *.

"2. Said Second Party shall, as of the close of business on October 20, 1928, take over, assume, and become liable for the payment of the following liabilities of First Party, in the amounts respectively shown by the aforesaid statement referred to in paragraph No. 1 hereof, and as the same appear on the books of First Party:

"a. The amount of all demand, time and other deposits, together with interest, if any, then accrued thereon.

"b. The amount of all outstanding cashier's checks and certified checks.

"c. The amount then owing to the Federal Reserve Bank of Kansas City, Missouri, on loans or rediscounts, for which First Party is liable, together with interest, if any, then accrued thereon.

"The aforesaid liabilities and obligations so enumerated shall constitute the sole and only liabilities and obligations of First Party which Second Party shall assume.

"3. The First Party, in consideration of the premises and of the assumption of and agreement to pay all of its liabilities and obligations to creditors, as above enumerated, by Second Party, shall concurrently therewith, execute and deliver to Second Party its note bearing date of October 22, 1928, in the sum of Five Hundred Eighty-nine Thousand Eight Hundred Twenty-three and 59/100 Dollars ($589,823.59) payable to order of Second Party on or before two years after its date with interest from date at the rate of six per cent (6%) per annum, payable December 10, 1928, and quarterly thereafter.

"4. Contemporaneously with the execution of this agreement and for the purpose of securing the debt and obligation of First Party to Second Party, evidenced by the note of First Party above mentioned, First Party agrees to sell, assign, transfer, convey, set over and deliver to Second Party, its successors and assigns, by and good and sufficient endorsement or conveyance, all of its property of every kind and character and wheresoever situated, except office furniture and fixtures * * *.

"5. It is agreed that all sums realized by Second Party for the liquidation of the assets transferred by First Party hereunder shall be deposited in a special account with Second Party to be designated, 'Watkins National Bank Liquidation Account.' Second Party shall allow interest on the average daily balance of said account at the rate of six per cent (6%) per annum, to be credited thereon December 10, 1928, and quarterly thereafter. From said account there shall be paid on December 10, 1928, and quarterly thereafter, the following items in the following order: First, any amounts properly paid or advanced by Second Party under the terms of this contract and agreement;[1] second, the interest on said principal note of First Party, to be computed to said date; and third, the balance shall be paid and credited upon said principal note in amounts of One Hundred Dollars ($100.00) or multiples thereof.

"6. Second Party, after the transfer and delivery of all the assets of every kind and character belonging to First Party as above specified, shall apply on the debt and obligation of First Party, as a credit, the amount of all cash on hand, drafts shall be drawn payable to Second Party for all balances owing to First Party by banks, bankers and trust companies, and the amounts thereof shall be applied on said debt and obligation when such drafts are paid. * * *

"7. * * * First Party shall transfer and deliver to Second Party, without cost to Second Party, all of its books, records, supplies on hand, signature cards, filing cabinets and stationery, * * *.

"8. It is further understood and agreed, and one of the considerations of this contract is, that Elizabeth M. Watkins shall

---

[1] The advancements to be made by Second Party under the provisions of Paragraphs 13, 15, and 16.

by a separate instrument in writing to be executed and delivered concurrently herewith, indemnify said Second, Party against any loss by reason of the execution of this agreement and on account of the liabilities and obligations imposed upon or resulting to the Second Party hereunder. Said instrument shall further provide that if, at the maturity of the note of First Party to Second Party, liquidation of the assets which are pledged as collateral to the payment of said note shall not have produced an amount sufficient to pay the principal of said note and interest thereon, together with any payments made by Second Party under Paragraphs 13, 15 and 16 hereof, said Elizabeth M. Watkins agrees thereupon to pay to Second Party an amount equal to the balance remaining unpaid to Second Party, and all of the assets pledged to Second Party as collateral security then remaining shall be turned over and delivered to her by due, proper and legal endorsement and assignment and thereupon all obligations of the Second Party hereunder shall cease and determine. * * * In the event said note and interest, together with any payments made by Second Party under Paragraphs 13, 15 and 16 hereof, shall be fully paid prior to the final maturity thereof from the proceeds of pledged assets, then, unless otherwise mutually agreed by and between First Party and Second Party, all remaining assets shall be redelivered to the liquidating committee of the First Party by due and proper endorsement and assignment, and thereupon all obligations of the Second Party hereunder shall cease and determine.

"9. Second Party shall, within thirty days from the date of the execution and delivery of this instrument, sell all bonds transferred to it hereunder, except bonds securing circulation, subject to the approval of First Party, and shall apply the purchase price received therefor on the debt and obligation due to Second Party in the manner set out in Paragraph 5 hereof. * * *

"11. With respect to all other assets transferred hereunder, Second Party shall at all times, until it has been repaid the full amount of the debt and obligation of First Party, with interest thereon as aforesaid, have the right to become the sole and absolute owner of any of the property and assets of First Party, or of any particular asset or property, by applying upon said debt and obligation of First Party the value or worth of such assets or property or the part thereof which is purchased and acquired, and such purchase shall be deemed to have been made when credit for the amount thereof has been given to First Party in Watkins National Bank Liquidation Account. The term 'value or worth' as used herein shall mean the amount of principal and interest represented by such asset or part thereof so purchased and acquired. With respect to real estate, the value thereof shall be determined by joint agreement of Second Party and the liquidating committee of the First Party. * * *

"13. No charge shall be made by Second Party for its expenses and services in liquidating the assets of First Party transferred hereunder except such legal and other expense as may be incurred in the collection of notes and assets by suit, if such suits shall be found necessary or proper by Second Party. Legal and other expenses of the liquidating committee shall be borne by First Party. By mutual consent, proper items of expense may be paid by Second Party out of the liquidation account. * * *

"15. First Party hereby expressly represents that there are no outstanding obligations of any nature whatsoever not shown in its statement of condition as of the close of business on October 20, 1928, hereto attached, save and except sundry accounts and taxes payable, and it further warrants and guarantees the genuineness of all assets according to said statement and the existing collateral security. First Party agrees that if Second Party is compelled to pay and satisfy any sundry accounts or obligations for taxes accrued or any obligation of any nature whatsoever not shown in said statement such disbursements shall constitute a lien against the assets of First Party transferred hereunder and Second Party shall have the right and authority to make such payments and reimburse itself before any credits are made upon the debt and obligation of First Party to Second Party.

"16. Interest on time deposits, savings accounts and other interest bearing accounts shall be paid by Second Party as it becomes due. The amount of any interest payments so made shall be prorated between First Party and Second Party as of October 22, 1928, the pro-

portion of interest accruing after said date being charged to Second Party and the proportion accruing up to October 22, 1928, being charged to First Party. Second Party shall have the right to reimburse itself for the First Party's proportion out of the transferred assets before any credits are made upon the debt and obligation of First Party to Second Party. * * *

"18. It is expressly understood and agreed that Second Party does not assume any obligation or liability in connection with the liquidation of First Party other than as specified and provided herein. It is no part of its duty to enforce the collection of assets held it as security hereunder, but only to receive payments thereon and to make proper application of the proceeds as collected. Second Party may, however, take any or all proper steps to enforce such collections, at its discretion, as hereinbefore provided, and in such cases shall only be responsible for failure to exercise reasonable diligence in connection therewith."

In accordance with the contract, the Watkins Bank executed its note to the Lawrence Bank, and delivered to the Lawrence Bank, a statement of the liabilities to be assumed by the latter, the aggregate amount of which equaled the principal sum of the note.

Among the deposit accounts in the Watkins Bank, on October 20, 1928, were certain inactive accounts aggregating $16,023.38, which were carried in a card index and single ledger account, designated the "morgue" account.

The above mentioned statement included the inactive, or "morgue," accounts, as well as the active accounts of the Watkins Bank.

All of the books and records of the Watkins Bank, including the card index and the ledger sheet of the "morgue" account, were turned over to the Lawrence Bank.

On December 22, 1928, and once each week for sixty days thereafter, the Watkins Bank published in the Daily Bond News, New York City, and the Lawrence Democrat the following notice:

"The Watkins National Bank, located at Lawrence in the State of Kansas, is closing up its affairs. All note-holders and others, creditors of said association, are hereby notified to present the notes and other claims against the association for payment.

"E. F. Huddleston, Cashier.
"Dated At Lawrence, Kansas, December 12, 1928."

The desire of the Lawrence Bank to secure the transfer to it of the deposit accounts of the Watkins Bank, was an important inducement to the Lawrence Bank to enter into the contract. A member of the liquidating committee testified as follows:

"It was then determined that the bank could not continue at a profit, although not insolvent, and the directors and officers thought it advisable, after talking over several methods of liquidation, to liquidate through another bank, to save the overhead expense and of course the other bank would be recompensed by the business it gained through the liquidation; * * * a part of the compensation to any bank that took over the obligations of the Watkins National Bank was the getting of the business of those deposits and all the activity that flows from them, and that was a part and parcel of the consideration flowing from the Watkins National Bank to the Lawrence National to induce the Lawrence National to enter into the agreement."

On October 23, 1928, the Lawrence Bank published an advertisement in the Journal World, a newspaper published at Lawrence, Kansas, stating that the Lawrence Bank had taken over the deposit accounts of the Watkins Bank and soliciting the business of the customers of the Watkins Bank.

The Lawrence Bank sent out letters to many of the customers of the Watkins Bank, which, except as to amounts of the deposits, were in substantially the following tenor:

"Dear Customer:
"Your account with the Watkins National Bank close of business October 20th, showed $45.20. You also had on deposit with the Lawrence National Bank at that time the sum of $421.52. Owing to the fact that these two well known banks have merged their business we are taking the liberty to combine your two accounts and at present your account shows a balance of $466.72.

"We indeed hope that our method of handling this matter meets with your entire approval, since we have been advised

by Bank authorities that this is the best and only way of handling the matter.

"Anticipating an early call from you we beg to remain,

"Yours very truly,
"Lawrence National Bank,
"By Cashier."

The assets of the Watkins Bank pledged with the Lawrence Bank were collected, and from time to time applied on the note. The note was fully liquidated on September 10, 1930. All of the pledged assets or proceeds thereof in the hands of the Lawrence Bank, which had not been applied on the note were then returned to the liquidating committee. This left in the hands of the Lawrence Bank, cash or its equivalent, derived from payments on the note, equal to the then unpaid deposit liabilities of the Watkins Bank, the exact amount of which the record does not disclose.

The Lawrence Bank paid many of the deposit liabilities of the Watkins Bank, including those embraced in the "morgue" account, from time to time, as they were demanded.

On August 16, 1932, the liquidating committee of the Watkins Bank made demand upon the Lawrence Bank to account for an amount equal to the unpaid amount of the "morgue" account. The demand was refused and the liquidating committee brought this suit for an accounting. On the date of the trial $735.-52 of the "morgue" account had been paid out on checks of customers, and $1,-658.16 had been charged off for service charges, leaving a balance of $13,-629.70.

The trial court found that the Lawrence Bank should account to the liquidating committee for the sum of $15,287.-86, with interest from December 12, 1931, at 6% per annum, and entered its decree accordingly. The Lawrence Bank has appealed.

The contention of the liquidating committee is, that the proceeds of the note were deposited with the Lawrence Bank, as agent of the Watkins Bank, as a liquidating fund with which the Lawrence Bank was to discharge the specified obligations of the latter Bank; that the liabilities of the Watkins Bank for the unpaid "morgue" account, became barred by the statute of limitation on December 12, 1931; and that the Lawrence Bank should account to the liquidating committee for the unused portion of the liquidating fund.

The contention of the Lawrence Bank is that the contract was made between the two banks for the benefit of certain creditors of the Watkins Bank; and that the Lawrence Bank, by the terms of the contract, assumed and agreed to pay the liabilities of the Watkins Bank to such creditors; and that it is still liable to pay the unpaid portion of the "morgue" account on demand.

By the express terms of the contract, the Lawrence Bank agreed to "take over, assume, and become liable for the payment" of all demand, time and other deposits, and any accrued interest thereon, all outstanding cashier's checks and certified checks, and the amount due the Federal Reserve Bank of Kansas City, Missouri, on loans and rediscounts. The note of the Watkins Bank was given in consideration "of the assumption of and agreement" by the Lawrence Bank "to pay," such deposits, checks, loans, and rediscounts. The contract provided that the Lawrence Bank should assume and pay the interest accruing after October 22, 1928, on time deposits and savings accounts. These provisions of the contract strongly indicate it was the intent of the parties, unqualifiedly to obligate the Lawrence Bank to pay the enumerated liabilities of the Watkins Bank.

The amount of the note was not set up on the books of the Lawrence Bank to the credit of the Watkins Bank as a liquidating fund; on the contrary, the Lawrence Bank set up on its records, the note as an asset, and the assumed debts as liabilities. It is true, provision was made in paragraph 5, for a liquidation account, but it was to liquidate the note, not the assumed liabilities, from the moneys realized from the pledged assets; and when the note had been paid, the balance of the pledged assets were to be redelivered and the account closed.

The contract made no provision for setting up the amount of the note as a credit to the Watkins Bank, no provision for a report by the Lawrence Bank of its disbursements in discharging the assumed liabilities, and no provision for an accounting by the Lawrence Bank. It is reasonable to assume the parties would have incorporated such provisions in the contract, had they intended the relation

between the banks to be that of principal and agent.

Counsel for appellees predicate their contention, in part, on the provisions of paragraph 8, that upon payment of the note by Elizabeth M. Watkins "all of the assets pledged to Second Party as collateral security then remaining shall be turned over and delivered to her * * * and thereupon all obligation of the Second Party hereunder shall cease and determine"; and that upon the payment of the note by the Watkins Bank "all remaining assets shall be redelivered to the liquidating committee * * * and thereupon all obligations of the Second Party hereunder shall cease and determine."

It will be noted that under paragraphs 5, 9, 11, 13 and 18 of the contract, the Lawrence Bank assumed certain duties and obligations with respect to the pledged assets. We think it was those obligations that were to cease and determine upon the redelivery of the remaining pledged assets, and not the obligation of the Lawrence Bank to pay the liabilities which it assumed. The parties have so construed the contract. The note was paid and the remaining pledged assets redelivered to the liquidating committee on September 10, 1930. If all obligations of the Lawrence Bank, under the contract, then ceased and determined, the liquidating committee would have then demanded an accounting for the difference between the amount of the note and the amount the Lawrence Bank had paid out in discharge of the liabilities assumed by it. No such demand was made.

The language of the Supreme Court in Brooklyn Life Insurance Company v. Dutcher, 95 U.S. 269, 273, 24 L.Ed. 410, is apposite:

"There is no surer way to find out what parties meant, than to see what they have done. Self-interest stimulates the mind to activity, and sharpens its perspicacity. Parties in such cases often claim more, but rarely less, than they are entitled to."

The Lawrence Bank continued to carry the unpaid assumed debts as its liabilities and to discharge them on demand. The demand made on August 16, 1932, almost two years after the note was paid, was not for an accounting of unpaid assumed debts, but only of the unpaid "morgue" accounts. It was not predicated on the theory that all obligations of the Lawrence Bank had ceased and determined when the note was paid, and the remaining pledged assets redelivered, but upon the theory that the liability of the Watkins Bank on the unpaid "morgue" deposit account had become barred by the statute of limitations on December 12, 1931.

Furthermore, as stated above, the securing of the deposit accounts of the Watkins Bank was an important inducement to the Lawrence Bank to enter into the contract. This benefit to the Lawrence Bank could only be fully effectuated by the Lawrence Bank taking over as its own liabilities, the deposit liabilities of the Watkins Bank. It would have substantially impaired the value of such benefit, if the Lawrence Bank, on the payment of the note and the redelivery of the remaining pledged assets, had been required to turn back to the Watkins Bank, the undischarged deposit liabilities of the Watkins Bank.

We think it clear that the parties intended the obligation of the Lawrence Bank, to pay any unpaid liabilities assumed by it, should continue after the note was paid and the remaining pledged assets redelivered.

Continuously since the contract was entered into, the Lawrence Bank has treated the liabilities as its liabilities. It set them up on its books as such. It notified many of the depositors of the Watkins Bank of that fact by letter. It published a notice to that effect. The Watkins Bank, at no time objected to the course pursued by the Lawrence Bank until the demand of August 16, 1932.

■ Where the language of a contract is ambiguous, the practical construction which the parties have placed upon it is entitled to great weight in determining its proper interpretation.[2]

We conclude that by the terms of the contract, the Lawrence Bank assumed, and agreed to pay the liabilities of the Watkins Bank, stipulated in the contract, including the "morgue" account deposit liabilities.

---

[2] Lowrey v. Hawaii, 206 U.S. 206, 222, 27 S.Ct. 622, 51 L.Ed. 1026; Sternberg v. Drainage Dist. No. 17 (C.C.A. 8) 44 F.(2d) 560; Kretni Development Co. v. Consolidated Oil Corporation (C.C.A. 10) 74 F.(2d) 497, 500.

A contract in which a promisor engages to the promisee to render some performance to a third person is generally called a contract for the benefit of a third person.

■ While the right of a third person to maintain an action on such a contract is in a sense remedial, it depends upon his substantive rights under the contract; it goes to the obligation of the contract; it involves an interpretation of the contract. Federal Surety Co. v. Minneapolis Steel & Machinery Co. (C.C.A.8) 17 F.(2d) 242, 244; Brown v. Ford Motor Co. (C.C.A.10) 48 F.(2d) 732, 734.

■ The law of the place where the contract is made governs its nature, obligation and interpretation, unless the parties, when entering into the contract, intend to be bound by the law of some other state. Federal Surety Co. v. Minneapolis Steel & Machinery Co., supra; Brown v. Ford Motor Co., supra; Mutual Benefit H. & A. Ass'n v. Baldridge (C.C.A.10) 70 F.(2d) 236, 239.

Hence we turn to the Kansas decisions. In Burton v. Larkin, 36 Kan. 246, 13 P. 398, 399, 59 Am.Rep. 541, the court said:

"It is unquestionably true that in this state a person, for whose benefit a promise to another upon a sufficient consideration is made, may maintain an action on the contract in his own name against the promisor. * * *

"But there are limitations upon this rule; or, rather, the rule is not so far extended as to give to a third person, who is only indirectly and incidentally benefited by the contract, a right to sue upon it. In the case of Simson v. Brown, 68 N.Y. 355 et seq., the following language is used: 'It is not every promise made by one to another, from the performance of which a benefit may inure to a third, which gives a right of action to such third person, he being neither privy to the contract nor to the consideration. The contract must be made for his benefit, as its object, and he must be the party intended to be benefited.' We think this is a correct statement of the law." [3]

■ It is not necessary that the third person be expressly named in the contract; it is sufficient if he is so described therein that his identity is ascertainable; and where the contract is for the benefit of a class definitely described in the contract, it is sufficient if he is a member of the class. [4]

■ It is not essential that the third person know of the contract at the time it is made. [5]

■ No express assent or formal acceptance by the third person is necessary. [6]

[3] See also, Algonite Stone Mfg. Co. v. Fidelity & Deposit Co., 100 Kan. 28, 163 P. 1076, 1079, L.R.A.1917D, 722; Gust v. Provident Life & Acc. Ins. Co., 136 Kan. 88, 12 P.(2d) 831, 833; Bank of Garnett v. Cramer, 7 Kan.App. 461, 53 P. 534; Anthony v. Herman, 14 Kan. 494; Harrison v. Simpson, 17 Kan. 508, 512; Floyd v. Ort, 20 Kan. 162, 164; Alliance Mutual Life Assur. Soc. v. Welch, 26 Kan. 632, 641; Plano Mfg. Co. v. Burrows, 40 Kan. 361, 19 P. 809, 810; Mumper v. Kelley, 43 Kan. 256, 23 P. 558; Staley v. Weston, 92 Kan. 317, 140 P. 878, 880; Hardesty v. Cox, 53 Kan. 618, 36 P. 985, 986; Strong v. Marcy, 33 Kan. 109, 5 P. 366, 367; Norman v. Rullman, 93 Kan. 791, 145 P. 818, 819.

[4] Weld v. Carey, 122 Kan. 666, 253 P. 235; Burton v. Larkin, 36 Kan. 246, 13 P. 398, 400, 59 Am.Rep. 541; Algonite Stone Mfg. Co. v. Fidelity & D. Co., 100 Kan. 28, 163 P. 1076, 1079, L.R.A.1917D, 722.

[5] Griffith v. Stucker, 91 Kan. 47, 136 P. 937, 939; Kansas Pac. R. Co. v. Hopkins, 18 Kan. 494, 500; Ballard v. Home Nat. Bank, 91 Kan. 91, 136 P. 935, 936, L.R.A. 1916C, 161; Goeken v. Bank of Palmer, 104 Kan. 370, 179 P. 321; Rodgers v. Reinking, 205 Iowa, 1311, 217 N.W. 441, 444.

[6] Bay v. Williams, 112 Ill. 91, 1 N.E. 340, 342, 54 Am.Rep. 209; Zwietusch v. Becker, 153 Wis. 213, 140 N.W. 1056; Tweeddale v. Tweeddale, 116 Wis. 517, 93 N.W. 440, 443, 61 L.R.A. 509, 96 Am.St. Rep. 1003; Waterman v. Morgan, 114 Ind. 237, 16 N.E. 590, 592; Rodgers v. Reinking, 205 Iowa, 1311, 217 N.W. 441, 444; In Re Staver's Estate (Wis.) 260 N.W. 655, 658; Ætna Ins. Co. v. Texarkana Nat. Bank (Tex.Civ.App.) 60 S. W.(2d) 251, 253. In a few jurisdictions, it has been held that the third person acquires no rights under contract until by statement or act he indicates his assent thereto. Blake v. Atlantic Nat. Bank, 33 R.I. 464, 82 A. 225, 39 L.R.A.(N.S.) 874; Johnson v. Central Trust Co., 159 Ind. 605, 65 N.E. 1028; Spalding v. Henshaw, 80 Ky. 55, 44 Am.Rep. 463; Jones v. Higgins, 80 Ky. 409.

His assent and acceptance will be presumed from the fact of benefit without burden.[7] To rebut this presumption the third person's dissent must be shown.[8] We have found only one Kansas decision on the question of assent or acceptance by the third person. *Wellman v. Knapp,* 126 Kan. 473, 268 P. 817. It indicates the Kansas Supreme Court is in accord with the above rules.

Where an action has been brought, upon the promise of a third person to assume and pay the debt of the promisee, within the statutory period after such promise was made, the fact that the original debt had become barred by the statute of limitations when such action was commenced, is no defense thereto.[9]

Under the principles announced and applied in the Kansas decisions hereinbefore cited, we conclude that the contract was made for the benefit of the depositors of the Watkins Bank, that it was the intention of the contracting parties the depositors should be directly benefited thereby, that the Lawrence Bank is still liable, under the contract, to pay the unpaid depositors included in the "morgue" account, and that, each of such depositors may enforce the obligation to him by an action in his own name.

The decree is reversed with instructions to dismiss the bill. The costs will be assessed against the Watkins Bank.

McDERMOTT, Circuit Judge (concurring).

I concur in all that has been said by Judge PHILLIPS. His careful analysis of the contract and the legal principles applicable thereto lead to the same conclusion as does a bird's-eye view of the whole transaction.

The Watkins Bank, an old and solvent institution of standing, wanted to liquidate its affairs. Its concern to protect its depositors in full was such that Mrs. Watkins pledged her personal fortune in order that the depositors might be paid if the bank assets proved insufficient for that purpose. I cannot believe that the parties intended, when this contract was drawn, that any depositor, however small, should have his check dishonored because of the statute of limitations.

Yet the theory of this case is that the stockholders of the Watkins Bank are entitled to the moneys of those depositors who did not draw out their balances before the statute ran as to the Watkins Bank, for no distinction can be drawn between "morgue" deposits and others, the only difference being that the bank keeps a record of a morgue account on a card and of others on a sheet.

The bill of complaint alleges that the depositors' accounts sued for "have been barred and cannot now be asserted either against said Watkins National Bank or against said Lawrence National Bank." It is now asserted that the Lawrence Bank is no longer liable on its contract of assumption.

I disagree. The Lawrence Bank unequivocally agreed to pay these deposits, and it is not relieved of that liability because the Watkins Bank published a liq-

---

[7] Re Stavers' Estate, supra; Tweeddale v. Tweeddale, supra; Baker v. Eglin, 11 Or. 333, 8 P. 280, 281; Rogers v. Gosnell, 58 Mo. 589; Johnson v. Staley, 32 Ind.App. 628, 70 N.E. 541, 543; Lawrence v. Fox, 20 N.Y. 268, 274.

[8] Rogers v. Gosnell, supra.

[9] Schmucker v. Sibert, 18 Kan. 104, 112, 26 Am.Rep. 765; Disney v. Healey, 73 Kan. 326, 85 P. 287; Kuhl v. Chicago & N. W. Ry. Co., 101 Wis. 42, 77 N.W. 155; Williston on Contracts, Vol. 1, § 398. In Schmucker v. Sibert, supra, the court said:

"But the grantee in such a deed was not liable before its execution. His liability dates from that. That is the first contract he has made, the first obligation he has assumed. At that time therefore, as to him, the statute first commences to run. Nor is he discharged by the fact that the debt as to the original debtor has since his promise become barred by the statute of limitations. For his contract is an original, absolute promise to pay the debt, and not a mere contract of indemnity, and to save the original debtor harmless. The creditor may ignore the original debtor entirely, and proceed directly and solely upon this promise. The grantee is not simply a surety. His promise is not to see that the original debtor pays, or to pay if he don't. But it is a direct, absolute and unconditional promise to pay the debt to the creditor. Even where there has been only a guaranty of payment, it has been decided that the statute did not commence to run as to the guarantor until the date of his guaranty. Thomas v. Croft, 2 Rich. (S.C.) 113 [44 Am.Dec. 279]; Cruger v. Daniel, 8 U.S. Digest, Abbott's Rev. 790, or, [Id.] 1 McMul.Eq.(S.C.) 157."

uidation notice. And the statute of limitations does not commence to run against a depositor in an open bank until a demand is made and refused. In a suit for a deposit, the Supreme Court of Kansas held "The statute began to run from the demand." Talcott v. First National Bank, 53 Kan. 480, 484, 36 P. 1066, 1067, 24 L.R.A. 737.

To sustain this judgment, the contract must be construed as meaning one of two things: (1) That as soon as the statute of limitations ran as to the Watkins Bank, the moneys of all depositors whose accounts were carried on a card instead of a sheet should be forfeit to the stockholders of the Watkins Bank; or, (2), that the Lawrence Bank should pay those depositors out of the funds of its own stockholders. For if this judgment stands, and small depositors present checks for their balances tomorrow or next year—as some will do—then the Lawrence Bank must either dishonor them or pay them. The stockholders of Watkins are thus unjustly enriched by this judgment, either at the expense of the depositor or the stockholders of the Lawrence Bank. The stockholders of the Lawrence Bank are not enriched by a contrary holding, for the liability to these depositors will remain as long as the bank is open, and the bank must maintain reserves against them and go to the expense of keeping a record of them. They can never be distributed to the stockholders.

It is quite impossible for me to believe that the men of character and experience who made this contract contemplated, as does the bill in this case, that at the end of the period of limitations the pittance of the small depositor should be appropriated to the stockholders of the Watkins Bank. On the contrary, they intended that even the small depositor should be paid on demand, no matter when demanded.

LEWIS, Circuit Judge (dissenting).

While solvent the Watkins National Bank of Lawrence, Kansas, decided to cease business and liquidate. Rev.St., §§ 5220, 5221 (12 U.S.C.A. §§ 181, 182). It published the notices required by the latter section. It entered into a contract with the Lawrence National Bank of Lawrence, Kansas, the material parts of which are set out in the opinion supra. As required by that contract the Watkins Bank gave its promissory note to the Lawrence Bank on October 22, 1928, payable on or before two years after date for $589,823.59, which equalled in amount all of its deposits of every kind and its cashier's and certified checks as shown by its books. The note did not include its rediscounts, capital stock liability, surplus and undivided profits; amounting to $261,447.62. As collateral security for the payment of the note the Watkins Bank agreed to assign and turn over to the Lawrence Bank all its assets, and the latter's duty under the contract was to realize what it could out of the assets received from the Watkins Bank to pay said note. The Lawrence Bank opened an account, "Watkins National Bank Liquidation Account," and when collections outright were made or transfer by agreement of liability of the debtor to the Lawrence Bank from the Watkins Bank, credit was given to this account, which amounts so entered were later credited on said note, which resulted in its payment within less than two years after its date. A settlement was then had between the two banks, but the Lawrence Bank withheld $15,287.86, and appellees in this suit recovered judgment therefor, from which defendant below has appealed.

As clearly shown by the pleadings, opening statements of counsel when the trial came on, and the proof, the controversy arises from this: All of the books, card indexes and records of the Watkins Bank were turned over to the Lawrence Bank to be used by it in execution of the contract on its part. Those books had a depository account entitled "Morgue Account." No individual name appeared upon it. When turned over to the Lawrence Bank it had a total deposit credit of $16,023.38. The Watkins Bank was an old institution, and this morgue account had been built up over a period of 40 years. It was a consolidation of some 2,000 depository accounts. Some of the depositors had been students at the state university at Lawrence who went away leaving small deposits in their accounts. Others did likewise. Their postoffice addresses were unknown, and after a few years what small balance each had was transferred to this morgue account. However, a system of card index was kept showing the name and amount of each depositor whose balance had been transferred to this account. The Lawrence Bank paid out of this morgue

account a total of $735.52, leaving a balance of $15,287.86, for which amount judgment was rendered. The note for $589,-823.59 covered in its amount the morgue account, and because of that fact and the fact that the Lawrence Bank assumed the duty 'to realize on the assets and pay the liabilities it insisted that it was entitled to retain the amount recovered to protect itself against claimed liability on the morgue account.

Clearly the fund in controversy does not belong to the Lawrence Bank. It belongs to the Watkins Bank, and the former knew that the latter had ceased business, was in liquidation when the contract was made, and the National Bank Act (12 U.S.C.A. § 21 et seq.) contemplates that all of the bank's assets must be distributed to those to whom they lawfully belong. The requisite notices had been published to that end so that all creditors might be advised.

It therefore seems that the two banks had in mind what has just been said when they entered into the contract, particularly paragraph number 8 thereof. That paragraph required that the note be fully paid on or before its maturity either by the maker or by Mrs. Watkins, a guarantor, and that if Mrs. Watkins made payment the remaining assets in the hands of the Lawrence Bank should be turned over to her, but if payment should be made prior to maturity out of the pledged assets the remaining assets should be turned over to the Watkins Bank; and whether paid by Mrs. Watkins or out of the pledged assets on or prior to maturity all obligations of the Lawrence Bank on the contract should thereupon cease. More than one month prior to the maturity of the note it had been fully paid out of pledged assets. Under the clear terms of this paragraph the obligations of the Lawrence Bank then ceased, and it was its duty to return the remaining assets in its hands to the Watkins Bank, which it refused to do to the extent stated. It was no longer liable on the contract to make further payments to morgue account depositors or other character of depositors. Its obligations in that respect had ceased and terminated. The first sentence of paragraph 18 of the contract is in confirmation of this conclusion. This is again confirmed, I think, in Mrs. Watkins' written guarantee. It provides that if the

$589,823.59 note should not be paid from the pledged assets, then she would pay to the Lawrence Bank "an amount equal to the balance then remaining unpaid to said party of the second part under the terms of said contract; and that said party of the first part (Mrs. Watkins) shall thereupon be entitled to the remaining assets pledged as collateral to said note then held by said party of the second part, according to the terms of said agreement hereinabove referred to." It is true, of course, that the contract between the banks was made for the benefit of third parties, but to the extent therein limited. No one claiming to be a beneficiary under the contract is here asserting a claim to the fund in question, and I know of no rule or principle under or by which he would be entitled to enlarge or extend the expressed and limited obligation of the Lawrence Bank for his benefit.

Clearly, though in deference, the judgment below in my opinion should be affirmed.