IN RE PHYLLIS L. CROWDER, Chapter 7, Debtor.
CATALINA DEVELOPMENT, INC., Appellant,
v.
BERNARD R. GIVEN II, Trustee, Appellee.
BAP No. NM-07-068,
Bankr. No. 96-10336-m7
United States Bankruptcy Appellate Panel, Tenth Circuit.
September 17, 2008
Before MICHAEL, BROWN, and McNIFF[1], Bankruptcy Judges.

OPINION[*]
BROWN, Bankruptcy Judge.
Appellant Catalina Development, Inc. ("CDI") appeals an order of the bankruptcy court approving the settlement of a claim made against the bankruptcy estate by Paseo Village Homeowners Association (the "Homeowners Association"). Bernard R. Given II, as the Chapter 7 trustee (the "Trustee") entered into a settlement agreement ("Settlement Agreement") that not only compromised a claim against the estate, but also conveyed the bankruptcy estate's interest in certain roads to the Homeowners Association. CDI objected to this conveyance because it did not acknowledge a previous right of access granted to CDI by the Trustee that was memorialized in a memorandum agreement (the "Memorandum"). The bankruptcy court concluded that the prior right of access conveyed to CDI was only temporary in nature and did not burden the property subsequently conveyed by the Trustee to the Homeowners Association. We AFFIRM.

I. Background
On the date of filing, the assets of this bankruptcy estate included interests in certain residential streets in Santa Teresa, New Mexico. One such street, named "Apache Gold Loop," located within the Paseo Village subdivision, was in poor condition and in need of substantial repairs. One of its intersections had a sizeable crater. The Trustee had concerns that the estate might incur liability as a result of these road conditions, but the projected cost of repairs was significant. Disputes arose as to who was responsible for the repairs. Appellant CDI is a developer of the Franklin View Estates, which is adjacent to the Paseo Village subdivision. Some of the lots in Franklin View Estates front the Apache Gold Loop road. The Trustee has asserted that CDI's use of the Apache Gold Loop has contributed to its state of disrepair. In turn, CDI has asserted that the El Paso Electric Company and/or Dona Ana County (the "County") are responsible for the cost of repairs. In filing its proof of claim, the Homeowners Association has asserted that the bankruptcy estate is liable for the repairs.
After several unsuccessful attempts to obtain commitments for road repairs from either El Paso Electric Company, CDI, or Dona Ana County,[2] the Trustee set up a joint meeting, including representatives of the Homeowners Association as well. At the meeting, the negotiations encompassed not only the cost of repairs, but also CDI's request for access to the roads that would provide it with ingress and egress to the Franklin View Estates.[3] While these settlement talks were productive, the parties were not able to reach a complete consensus. According to the Trustee, "[t]he only resolution that was reached was that we would have a 60-day cool-off period; that during that 60 days the parties would try and meet again to see if we could reach a resolution on who was going to pay for what repairs, what was going to happen prospectively with the roads in terms of title/ownership and that in that 60-day period, [CDI] would have a right of access."[4]
Following this meeting, CDI's counsel drafted a "Memorandum" to memorialize their standstill agreement. The Memorandum provides:
1. Barney Given, Trustee and Greg Collins (including Catalina Development, Inc. . . .) agree that they will jointly pay for the cost of bringing that part of Apache Gold Loop shown on Exhibit A . . . to a state of good condition and repair and will negotiate in good faith over the next 60 days to arrive at an agreement on the split of the total cost.
2. Barney Given, Trustee hereby grants Greg Collins (including Catalina Development, Inc. . . .) a right of access for all purposes over all the private streets in Santa Teresa, New Mexico that are owned by the Phyllis L. Crowder Bankruptcy Estate.[5]
The present dispute centers on whether the second paragraph, granting CDI a right of access, was also subject to the 60-day limitation set forth in the first paragraph.
There is no dispute, however, that the Trustee permitted CDI continued access to the estate's roads subsequent to this sixty-day period.[6] The parties continued their negotiations as well. But approximately eight months after executing the Memorandum, the Trustee threatened to "revoke [his] authorization for Mr. Collins to utilize these streets for access to his development."[7]
In addition, the Trustee objected to the proof of claim of the Homeowners Association. They eventually resolved their differences and entered into a settlement agreement. It obligated the bankruptcy estate to pay the Homeowners Association $50,000 and to quitclaim any interest of the estate in the streets within the Paseo Village subdivision. In exchange, the Homeowners Association released any existing or future claims against the estate and assumed responsibility for maintaining and repairing the streets.[8] When the Trustee sought court approval of his settlement with the Association, CDI objected, claiming that any conveyance of the streets in the proposed settlement must be subject to the right of access granted to CDI in the Memorandum.[9]
The bankruptcy court conducted an evidentiary hearing on the Trustee's settlement with the Homeowners Association. The court heard testimony from the Trustee, a representative of the Homeowners Association, and Gregory Collins, as CDI's representative. The court found that the settlement was in the best interest of the estate and met the standards for approval under Federal Rule of Bankruptcy Procedure 9019(a).[10] The court relied on the testimony of the Trustee as to his inspection of the condition of the streets, his meetings with the county, and the estimates for repair costs that he had obtained. The Trustee estimated a potential liability for repairs of existing conditions of up to $150,000, as well as liability for future maintenance costs.[11]
In regard to the nature of the right of access given in the Memorandum, the Trustee testified that he did not intend to grant a permanent right of access. He had refrained from revoking access after the 60-day period only because settlement efforts were ongoing and the continued access facilitated these negotiations.[12] In support of the Objection, Gregory Collins testified that, "[i]t was never discussed that it was a 60-day period of time."[13] Mr. Collins testified further that he had received approval from Dona Ana County for the building of his subdivision based on the right of access granted in the Memorandum.[14]
The bankruptcy court questioned the fact that the Memorandum had never been submitted to the court for approval. It also noted that it did not contain an acknowledgment block for the signatures, making it ineligible for recording and non-binding against subsequent parties without notice of its contents. When the Trustee and Gregory Collins executed the Memorandum on August 4, 2005, the original Memorandum contained signature lines, without any notary blocks. But approximately one year after its execution, Gregory Collins re-signed the Memorandum in the presence of a notary public and then recorded it in Dona Ana County.[15]
The bankruptcy court's Order both approved the Settlement Agreement and construed the language in the Memorandum as granting only a sixty-day right of access in favor of CDI, rather than a "permanent easement."[16] In reaching its conclusion that it was only a temporary easement, the court found that the language in the Memorandum was ambiguous and then applied the canon of construction that the ambiguity should be construed against the drafter, CDI. CDI has timely appealed the court's ruling that the Memorandum conveyed only a temporary right of access.

II. Appellate Jurisdiction
This court has jurisdiction to hear timely filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit, unless one of the parties elects to have the district court hear the appeal.[17] A decision is considered final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."[18] In this case, the order of the bankruptcy court approving the settlement and determining CDI's interest in the property conveyed to the Homeowners Association left nothing remaining for the bankruptcy court's consideration. Thus, the decision of the bankruptcy court is final for purposes of review. The Debtor's notice of appeal in this case was timely. Neither party elected to have this appeal heard by the United States District Court for the District of New Mexico. The parties have therefore consented to appellate review by this Court.

III. Standard of Review
Interpretation of an unambiguous contract is a question of law and is subject to de novo review on appeal. In re Villa W. Assocs., 146 F.3d 798, 802 (10th Cir. 1998); Milk `N' More, Inc. v. Beavert, 963 F.2d 1342, 1345 (10th Cir. 1992). The initial determination of whether a contract is ambiguous is also a legal conclusion reviewed de novo.[19] "Once it is determined that a contract is ambiguous and that its construction depends on extrinsic circumstances, interpretation of the contract becomes a question of fact."[20] "Findings of fact by a district court will not be set aside unless they are clearly erroneous."[21] In this case, however, CDI has not asserted error in the bankruptcy court's finding that the Memorandum was ambiguous or in its factual findings, but in the alleged failure of the court to give proper weight to the evidence before applying a canon of construction. The question of whether the bankruptcy court failed to consider or give proper weight to relevant evidence is subject to de novo review. Harvey ex rel. Blankenbaker v. United Transp. Union, 878 F.2d 1235, 1244 (10th Cir. 1989).

IV. Discussion

A. Court's Construction of Memorandum As Granting Only Temporary Easement Not Erroneous.
The sole issue identified by CDI on appeal is whether the bankruptcy court properly interpreted the language in the Memorandum when it concluded the Memorandum conveyed only a temporary right of access.[22] CDI argues that once the bankruptcy court found the language ambiguous, it prematurely applied a canon of construction to determine the meaning of the ambiguous terms. CDI contends that the court failed to weigh the evidence presented at the hearing.
New Mexico law governs the construction and interpretation of the Memorandum.[23] Under New Mexico law, "the language of the entire agreement should be construed together."[24] If it is found to be ambiguous, then "the jury or the court must engage in factfinding to determine the meaning of the contract."[25] As CDI has argued, the fact finder should first consider evidence of the facts and circumstances surrounding the agreement, as well as evidence of the parties' intent, and only then resort to canons of construction if the parties fail to offer such evidence.[26]
In this case, the bankruptcy court afforded the parties an opportunity to present evidence regarding the circumstances surrounding the execution of the Memorandum and as to their intent. Its ruling specifically mentions some, but not all, of the evidence presented. It makes findings regarding this evidence, but in the context of its ruling that the agreement was ambiguous. It did not then recite the same factual findings again in its attempt to interpret the Memorandum. Instead the court resorted to the canon of construction that construes the ambiguity against the drafter. What the bankruptcy court did not expressly state, but what this Court finds is implicit in its ruling, is that despite the presentation of evidence as to the circumstances and intent of the parties, the court could not determine the intent of the parties or that they had reached a meeting of the minds on this issue. In other words, despite the evidence, the ambiguity persisted. The bankruptcy court then properly resorted to a canon of construction.
The structure of the court's ruling, reproduced below, demonstrates that the court considered evidence presented at trial.
In applying these standards to the Memorandum, the Court finds that an ambiguity exists. The Chapter 7 Trustee testified that the Memorandum was reached as a result of a meeting among himself, Greg Collins, representatives from the city and representatives of Dona Ana County wherein the parties agreed to a "sixty-day cooling off period." Paragraph 1. by its terms references a sixty-day period, which is consistent with this testimony. Paragraph 2., on the other hand, contains no qualifying language in the granting of a right of access over the streets in the Santa Teresa subdivision. Given the circumstances surrounding the context in which the Memorandum was created, the Court finds that it is not clear whether the Memorandum as a whole was intended to apply only for a limited, sixty-day period. However, because counsel for CDI drafted the Memorandum, the Court will resolve this ambiguity against CDI. It is appropriate to construe an ambiguity in a contract against the party who drafted it when the Court cannot determine the parties' intent from the contract terms. See Smith v. Tinley, 100 N.M. 663, 665, 674 P.2d 1123, 1125 (1984)("ambiguities in a contract are to be construed against the party who drafted it.")(citation omitted); Gardner-Zemke Co. v. State, 109 N.M. 729, 733, 790 P.2d 1010, 1014 (1990)(noting that the rule that ambiguities are to be construed against the drafter only applies when the court is otherwise unable to ascertain the intent of the parties) citing El Paso Natural Gas Co. v. Western Bldg. Assocs., 675 F.2d 1135, 1141 (10th Cir. 1982). For these reasons, the Court concludes that the Memorandum does not create a permanent easement over the streets in the Santa Teresa subdivision.[27]
The italicized language in this paragraph constitutes the court's factual findings. It expressly considered: (1) the testimony regarding the meeting among the Trustee and representatives from the CDI, the PVHA and Dona Ana County; (2) the agreement to a "60-day cooling off period;" and (3) the fact that paragraph 1 of the Memorandum contained a sixty-day limitation, but that paragraph 2 did not. If the court had only mentioned the language of the Memorandum itself and then applied a canon of construction, then CDI's contention that the court had failed to consider evidence would have had greater merit. But the court referenced the testimony it had received at trial regarding the circumstances surrounding the execution of the Memorandum. It then made a finding as to the existence of an agreement to engage in a "60-day cooling off period." It then made a second finding that it was "not clear whether the Memorandum as a whole was intended to apply for a limited, sixty day period." This was the court's finding that, despite the evidence, the parties' intent remained unclear or that there was no meeting of the minds on this issue.
In its briefs, CDI argues that the court should have considered the following evidence before applying a canon of construction: (1) that the Trustee gave CDI continued rights to access the roads and threatened to revoke the access nearly eight months after executing the Memorandum; (2) that CDI agreed to pay and did pay for half of the road repairs in reliance on the estate's conveyance of a permanent right of access; and (3) that the structure of the Memorandum itself supports an interpretation of a permanent grant of access as paragraph 2 of the Memorandum does not limit the right of access to sixty days. This latter complaint is contradicted by the ruling itself because the bankruptcy court expressly noted the discrepancy between the sixty-day language contained in paragraph 1, but absent in paragraph 2, of the Memorandum.
At oral argument, this Court specifically asked CDI's counsel what evidence demonstrated CDI's intent that the right of access was to be permanent. The Court pointed out that the testimony of Mr. Collins at trial was only that "[i]t was never discussed that it was a 60-day period of time." Counsel responded to this Court that it was the fact that only paragraph 1 of the Memorandum contained a 60-day limitation. This fact, however, was expressly noted by the bankruptcy court.
The Court acknowledges that the bankruptcy court made no specific mention in its ruling of either the Trustee's grant of continued access and threatened revocation of the access rights or of CDI's contribution to the repairs. Federal Rule of Civil Procedure 52(a), made applicable by Bankruptcy Rule 7052, requires a trial court in a bench trial to "find the facts specially and state separately its conclusions of law thereon . . . ." Nothing in this rule mandates that the trial court specifically mention every fact presented at trial. But the findings must be more than conclusory in nature. A court's decision to refer to some evidence, but not other evidence, does not necessarily mean it overlooked the other evidence. It may only indicate that it did not find the other evidence persuasive or determinative. It is sufficient if the court makes findings as to the evidence on which it relied in rendering its determination. We recognize that this case presents a close question as to whether the court's findings were more than conclusory in nature. But taken as a whole, we conclude that the court made sufficient findings that there was no evidence of an actual agreement reached as to the duration of the right of access.
In addition, while this Court will not substitute its own factual findings for those of the trial court, the Court notes that the omission of any reference to the Trustee's threat to revoke the right of access does not necessarily support a finding that the access conveyed was intended to be permanent. To the contrary, if the conveyance was truly permanent, the Trustee would have had no right to revoke it. In terms of the evidence that CDI relied on the grant of access, this evidence at best demonstrates an assumption on CDI's part that the grant was permanent. But it does not demonstrate by itself that the parties reached a meeting of the minds as to this issue. In fact, Mr. Collins testified that this issue was never discussed. Thus, we cannot say it was clearly erroneous for the bankruptcy court to conclude that the ambiguity persisted despite the evidence presented.

B. Alternatively, the Memorandum's Grant of Easement Not Binding Absent Court Approval Process.
Even if we were persuaded that the bankruptcy court erred in interpreting the language of the Memorandum, or that it had failed to render sufficient findings of fact, we would affirm the bankruptcy court on alternative grounds.[28] If the Memorandum conveyed a permanent right of access, as CDI contends, then this purported conveyance by the Trustee involved the "sale" of estate assets to CDI. Pursuant to 11 U.S.C. § 363(b)(1), the "sale" of estate assets outside of the ordinary course of business is permitted only "after notice and a hearing." Section 102 of the Bankruptcy Code defines the requirements of this phrase. It requires a trustee to initiate a process to obtain court authorization by giving such notice as is appropriate in the circumstances.[29] He may then act without an actual hearing if either no party in interest timely requested a hearing or if the court has authorized the action without a hearing.[30] Thus, the entry of a formal court order approving the proposed transaction is not required.[31] But a trustee is only authorized to use, sell, or lease estate property (other than cash collateral) after he has complied with § 102's requirements for "notice and a hearing." We do not suggest that, by agreeing to a temporary grant of access, the Trustee had to invoke the court approval process, but if he had granted a permanent right of access, he was bound to comply with the Code's requirements. In this case, neither the Trustee nor CDI gave notice, or otherwise sought court approval, of the Memorandum. Thus, we conclude in the alternative, that if the Memorandum was intended to and in fact did grant CDI a permanent right of access, it was unenforceable against the estate.
In so ruling, we recognize that neither § 102 nor § 363 expressly addresses the consequence of failing to meet § 102's requirements. Nor has the Tenth Circuit directly addressed the question of whether an agreement entered into by a trustee to settle or to sell assets is legally binding prior to satisfying § 102's requirements. This issue arises often in the context of a trustee's receipt of a higher offer to buy estate assets, after he has already contracted to sell the assets to another, but before he has obtained court approval of his original contract. Courts are divided on this issue. Some courts hold that an agreement cannot be binding on the trustee absent court approval and, therefore, he is free to withdraw his prior agreement.[32] Other courts hold that an agreement is binding on all the parties pending court approval.[33]
While it does not directly address this issue, we find guidance in In re Broadmoor Place Investments, L.P.,[34] in which the debtor-in-possession ("DIP") signed an agreement with an initial bidder for the sale of a building. The DIP subsequently entered into a second agreement as a back-up bid, but sought approval of the first agreement. The bankruptcy court approved the second agreement because it contained fewer contingencies and allowed for a more immediate closing. On appeal, the Tenth Circuit held that the bankruptcy court did not have the authority to choose from competing bids because to do so would improperly place the court in estate administration. It held that "a Bankruptcy Court in a case such as this does have the power to disapprove a proposed sale recommended by a trustee . . . if it has an awareness there is another proposal in hand which, from the estate's point of view, is better or more acceptable."[35] In so ruling, the court observed that to call the first agreement a "contract" would be a "misnomer since there can be no contract in this situation without Bankruptcy Court approval [and] these instruments are but binding bids . . . ."[36]
The requirements of § 102 and § 363 for "notice and a hearing," coupled with the Tenth Circuit's observation in Broadmoor that, absent court approval, an agreement to sell estate property outside the ordinary course of business is not a binding contract, causes this Court to conclude that the grant of access rights set forth in the Memorandum, if it was intended to convey a permanent right of access, was unenforceable. Thus, regardless of whether he conveyed a temporary or permanent right of access in the Memorandum, the Trustee was free to negotiate the conveyance of the streets to the Homeowners Association, without expressly providing a right of access to CDI.

V. Conclusion
For the foregoing reasons, we conclude that the bankruptcy court did not err in its interpretation of the Memorandum. In the alternative, we affirm the Order on the basis that the Memorandum, if it was intended to convey a permanent right of access, was not binding on the Trustee because the parties failed to comply with the Bankruptcy Code's requirements of "notice and a hearing."
NOTES
[1] Honorable Peter J. McNiff, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Wyoming, sitting by designation.
[*] This unpublished opinion is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. 10th Cir. BAP L.R. 8018-6(a).
[2] Transcript of Motion to Approve Compromise Hearing held on February 12, 2007 ("Transcript"), at 23-24, 36, in App. Appx. at 107-08, 120. The Trustee believed that much of the damage to Apache Gold Loop occurred as a result of CDI's use of the road in its development of Franklin View Estates. Transcript at 26, in App. Appx. at 110. El Paso Electric Company denies responsibility for the damage. Transcript at 24, in App. Appx. at 108.
[3] Transcript at 20, in App. Appx. at 104.
[4] Transcript at 21, in App. Appx. at 105.
[5] Memorandom [sic], in App. Appx. at 75.
[6] Transcript at 28, 53, in App. Appx. at 112,137.
[7] April 18, 2006, Letter From Trustee to Frank Ainsa ("Letter"), in App. Appx. at 81.
[8] Paragraph 5 of the Settlement Agreement provides that the "Trustee shall convey to PVHOA, for $1.00 and other consideration herein described, all of the bankruptcy estate's right, title, and interest in the streets within the association by quitclaim deed, whereupon Trustee and the bankruptcy estate shall be released from any liability, obligation, or expense related to said streets in any way, and all such liabilities and obligations will be assumed by PVHOA." Exhibit A to the Motion to Approve Settlement of Paseo Village Homeowners Association Claim No. 184, in App. Appx. at 17.
[9] CDI also raised the following objections: (1) the claim was filed late and should not be approved; (2) PVHA should not be allowed to use settlement proceeds to pursue claims against CDI; (3) the settlement should not contain language assigning liability to CDI for street repair costs; and (4) that no payment should be made to PVHA until there has been resolution regarding the Trustee's intent to abandon other streets owned by the estate since other subdivisions may have claims against the bankruptcy estate for street repairs. Amended Objections of Catalina Development Inc., Santa Teresa Country Club, L.L.C. and Mesilla Bolson Properties, L.L.C. to Trustee's Motion to Approve Settlement of Paseo Village Homeowners Association Claim No. 184, in App. Appx. at 26-27.
[10] Subsequent references to the Rule or Rules shall refer to the Federal Rules of Bankruptcy Procedure.
[11] Order Granting Motion to Approve Settlement of Paseo Village Homeowners Association Claim No. 184 Subject to Certain Conditions ("Order"), in App. Appx. at 38-39. See also Transcript at 18-19, 36, in App. Appx. at 102-03, 120.
[12] Trustee's counsel proffered this explanation at oral argument made on July 18, 2008.
[13] Transcript at 98, in App. Appx. at 182.
[14] Transcript at 98-99, in App. Appx. at 182-83.
[15] Transcript at 18-19, in App. Appx. at 111-12. At oral argument, counsel for CDI argued that the parties had contemplated executing a subsequent document containing the necessary notarial blocks. This argument is not supported by the record. Although not included in the findings made by the bankruptcy court, Gregory Collins testified that he notarized and recorded the Memorandum on the advice of counsel and that he did not communicate his intention to do this to the Trustee. Transcript at 102-03, in App. Appx. at 186-87. Notably, Collins testified at the hearing that the parties did not discuss notarizing the Memorandum at the time of execution and that he did not know if the parties intended to record the Memorandum at the time of the original execution. Transcript at 103, in App. Appx. at 187.
[16] The bankruptcy court concluded that the Memorandum did not create a "permanent easement" over the streets in the Santa Teresa subdivision. Order at 10, in App. Appx. at 42. In New Mexico, an easement is "the generic term for a `liberty, privilege, right or advantage which one has in the land of another.'" Martinez v. Martinez, 604 P.2d 366, 368 (N.M. 1979) (quoting State v. Begay, 320 P.2d 1017, 1019 (N.M. 1958), overruled on other grounds by, State v. Warner, 379 P.2d 66 (N.M. 1963). Rights of "access," "ingress and egress" and a "right of way" are descriptive of specific easement rights. Martinez, 604 P.2d at 368. Although these terms appear to be used somewhat interchangeably in New Mexico, this opinion refers to the property right conveyed as a "right of access" as that is the operative language in the Memorandum.
[17] 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr. P. 8002.
[18] Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 712 (1996) (internal quotation marks omitted).
[19] In re Kaiser Steel Corp., 998 F.2d 783, 789 (10th Cir. 1993); Teton Exploration Drilling, Inc. v. Bokum Res. Corp., 818 F.2d 1521, 1526 (10th Cir. 1987).
[20] City of Farmington v. Amoco Gas Co., 777 F.2d 554, 560 (10th Cir. 1985).
[21] Id.
[22] The Trustee raised the issue in his opening brief of whether the bankruptcy court's ruling on the right of access constituted an advisory ruling, but later withdrew this as an issue at oral argument. Br. of Appellee at 1.
[23] Because the Memorandum concerns real property located in New Mexico and because the parties executed the Memorandum in New Mexico, New Mexico law governs its interpretation. "The interpretation and enforcement of contracts is (sic) traditionally within the province of state courts, and the general presumption is in favor of applying state law." Madsen v. Prudential Fed. Sav. & Loan Ass'n, 635 F.2d 797, 802 (10th Cir. 1980); (citation and internal quotation marks omitted); Lawrence Nat. Bank. v. Rice, 82 F.2d 28, 34 (10th Cir. 1936) ("The law of the place where the contract is made governs its nature, obligation and interpretation, unless the parties, when entering into the contract, intend to be bound by the law of some other state.").
[24] Allsup's Convenience Stores, Inc. v. N. River Ins. Co., 976 P.2d 1, 12 (N.M. 1999).
[25] Elliot Indus. Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d 1091, 1108 (10th Cir. 2005); Mark V, Inc. v. Mellekas, 845 P.2d 1232, 1235 (N.M. 1993).
[26] Mark V, Inc. v. Mellekas, 845 P.2d at 1236.
[27] Order at 9-10, in App. Appx. at 41-42 (emphasis added).
[28] An appellate court is "`free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court.'" Griess v. Colorado, 841 F.2d 1042, 1047 (10th Cir. 1988) (quoting Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 887 (2d Cir. 1987)); United States v. Sandoval, 29 F.3d 537, 542 n.6 (10th Cir. 1994).
[29] 11 U.S.C. § 102(1)(A).
[30] 11 U.S.C. § 102(1)(B).
[31] Compare § 363(b)(1)'s use of the phrase, "[t]he trustee, after notice and a hearing, may use, sell, or lease" with § 363(c)(2), "[t]he trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless  (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease . . . ." (emphasis added).
[32] Thousand Acres Dev., LLC v. Iannacone (In re Kreger), 307 B.R. 106, 111 (8th Cir. BAP 2004) ("[B]uyers routinely make offers to purchase assets from a trustee, which offers are subject to higher and better offers being received at the hearing for approval of the sale. But once the order approving the sale is entered, that order represents a binding obligation . . . ."); In re Smith, 352 B.R. 500 (Bankr. N.D. Ala. 2006) (trustee's motion to sell was not binding, and trustee did not breach any contractual obligations when, upon being advised of a higher offer, he withdrew his motion); Siddiqui v. Gardner (In re Williamson), 327 B.R. 578, 583 (Bankr. E.D. Va. 2005) (during the period between execution of the contract and the court hearing on approval, the property remained on the market, subject to higher offers and this was all part of the "normal process of exposing the property to the market"); In re Landscape Props., Inc., 100 B.R. 445, 447 (Bankr. E.D. Ark. 1988) (in sustaining objection to private sale based solely on availability of higher offer, court held there is no contract without bankruptcy court approval); In re Psychrometric Sys., Inc., 367 B.R. 670 (Bankr. D. Colo. 2007) (same); In re Am. Freight Sys., Inc., 114 B.R. 261, 263 (D. Kan. 1990) (Bankruptcy court did not err in considering competing bids on date of sale hearing because prior bid was merely "a proposed sale which was subject to the bankruptcy court's approval.").
[33] In re Frye, 216 B.R. 166, 173 (Bankr. E.D. Va. 1997) (see collection of cases therein); White v. C.B. Hannay Co. (In re Lyons Transp. Lines, Inc.), 163 B.R. 474, 476 (Bankr. W.D. Pa. 1994) (holding that absent fraud, a settlement agreement is binding pending approval by bankruptcy court).
[34] 994 F.2d 744 (10th Cir. 1993).
[35] Id. at 746 (citing In re Landscape Props., Inc., 100 B.R. 445 (Bankr. E.D. Ark. 1988).
[36] In re Broadmoor, 994 F.2d at 745 n.1 (citation omitted).