## NORTON et al. v. AGRICULTURAL BOND & CREDIT CORPORATION.*
### No. 1481.

Circuit Court of Appeals, Tenth Circuit.
Sept. 7, 1937.
On Rehearing Oct. 23, 1937.

Austin M. Cowan, of Wichita, Kan. (C. A. McCorkle, J. D. Fair, W. A. Kahrs, and Robert H. Nelson, all of Wichita, Kan., on the brief), for appellants.

John J. Yowell, of Chicago, Ill., and Benjamin F. Hegler, of Wichita, Kan. (John E. MacLeish and George W. Swain, both of Chicago, Ill., on the brief), for appellee.

Before PHILLIPS and BRATTON, Circuit Judges, and KENNEDY, District Judge.

PHILLIPS, Circuit Judge.

This suit was brought by the Agricultural Bond and Credit Corporation, hereinafter called the Finance Company, against Norton and others, individually and as members of Dealers' Protective Association, hereinafter called dealers, to restrain them from interfering with the collection by the Finance Company of purchase contracts and notes held by it.

*Writ of certiorari denied 58 S.Ct. 409, 82 L.Ed. ——.

The dealers filed answers and counter-claims. The counterclaims prayed for an accounting. The decree of the trial court granted the relief prayed for by the Finance Company and dismissed the counterclaims. The dealers have appealed.

The facts are these:

During the years 1929, 1930 and 1931, the dealers sold harvesting implements and machinery manufactured by the Gleaner Combine Harvester Corporation, herein-after called the manufacturer, on a com-mission basis. Each dealer purchased ma-chinery from the manufacturer under a standard contract, which was in the form of an order for machinery and is herein-after referred to as dealer's contract. Each dealer's contract provided that the title to machinery sold to the dealer should remain in the manufacturer until paid for in full; that upon the sale of a machine by the dealer that had not been paid for by the dealer, all of the proceeds of such sale, in-cluding cash, notes and purchaser's contract, should become the property of the manufac-turer and remain such until the dealer had fully paid his obligation under his dealer's contract. Each of the dealer's contracts contained a provision reading substantially as follows:

"When combine is sold on two year plan, Dealer will receive all commissions when 1930 harvest note is paid except 10% of 1931 harvest note, which will be retained and become payable when 1931 harvest note is paid by farmer.

"When combine is sold on three year plan, dealer will receive all of commission when 1930 harvest note is paid, except 10% of 1931 and 1932 harvest notes, which will be retained and become payable when each respective note is paid."

The dealer's contract also provided that upon repossession of a machine on which payments were in default, it should be sold at public auction and that the proceeds should be disbursed as follows: (1) In payment of the costs of repossession and sale, (2) in payment of the balance due the manufacturer, and (3) the balance, if any, to the dealer.

The dealer executed a separate dealer's contract for each order for a machine. The manufacturer billed the dealer and took his trade acceptance for the price. Upon sale of the machine, the dealer took from the purchaser and forwarded to the manu-facturer, cash, notes and a purchase con-tract and the manufacturer returned to the dealer his trade acceptance. Commissions were paid by check or credited on the dealer's indebtedness to the manufacturer. For the purpose of financing and comput-ing commissions, each sale was treated as a separate transaction.

On January 4, 1929, the manufacturer entered into a contract with the Finance Company under the terms of which the Finance Company agreed to take such pur-chase contracts as were acceptable to it and pay for each contract accepted, its face value less a finance charge and less "the dealer's commission." This contract pro-vided that the Finance Company should col-lect the commission from the purchaser and hold it in trust for the manufacturer or dealer. It read in part as follows:

"*It is expressly understood and agreed by the parties to this agreement that an amount corresponding to the dealer's com-mission, as hereinabove mentioned, shall represent the equity of the Manufacturer and/or dealer in each Contract purchased under this agreement, the remaining balance of each such Contract representing the equity of the Finance Company.* It is un-derstood and agreed that any moneys col-lected by the Finance Company over and above the amount of its own equity in any Contract purchased under this agreement shall be and remain the property of the Manufacturer and/or dealer and shall be held in Trust by the Finance Company for the Manufacturer and/or dealer and promptly remitted, or otherwise accounted for, to the Manufacturer and/or dealer by the Finance Company, as hereinabove pro-vided." (Italics ours.)

On December 17, 1929, the Finance Company and manufacturer entered into a similar contract. It referred to the dealer's commissions as hold backs. While it stated the hold backs should represent the equity of the manufacturer and the remainder the equity of the Finance Company in the purchase contracts, it recognized that the beneficial interest in hold backs was in the dealer. It referred to hold backs owing to the dealer and hold backs withheld from the dealer. It provided that the Finance Company might accept less than the amount due on the first installment of a purchase contract and extend the time for the pay-ment of the balance, but that if the amount accepted was not sufficient to justify the payment of the commission due on the first installment, the Finance Company should first obtain the consent of the dealer to the

acceptance of such partial payment and extension of the balance. It provided for an application of hold backs under certain conditions on indebtedness due from the dealer to the Finance Company or to the manufacturer and clearly showed that the parties intended that the dealer, where he was not indebted to either, should receive the hold backs, when collected.

It did not affect the relation of the parties as to purchase contracts and notes transferred to the Finance Company under the contract of January 4, 1929.

On November 7, 1930, the manufacturer and the Finance Company entered into a third contract. It provided that the Finance Company might apply hold backs on obligations due from the dealer to the Finance Company. It referred to hold backs as equivalent to the dealers' commissions.

On February 4, 1931, the Circuit Court of Jackson County, Missouri, appointed a receiver for the manufacturer. The receivership case was removed to the District Court of the United States for the Western Division of the Western District of Missouri. The last mentioned court appointed three receivers for the manufacturer. It authorized the receivers to continue the business of the manufacturer and to continue to transfer purchase contracts and notes to the Finance Company under the agreement of November 7, 1930, but expressly provided that all commissions and hold backs collected by the Finance Company should be paid by the Finance Company in cash to the receivers "for the benefit of the dealers entitled thereto." So far as the record discloses, the Finance Company made no objection to this order. It was a clear recognition that the dealers were entitled to the commissions when collected.

In each instance where purchase contracts were acquired by the Finance Company from the manufacturer under the three contracts above referred to, the amount of the dealer's commission was excluded from the amount paid therefor by the Finance Company.

From August 2, 1929, to July 2, 1931, the Finance Company wrote many letters to the dealers in which it recognized that the beneficial interests in the commissions and hold backs were in the dealers. These letters requested aid from the dealers in collecting the paper held by the Finance Company and contained statements of which those set out in the marginal note are typical.[1]

---

[1] "Your equity in the balance on this account is represented by your reserve commission of $87.75."

"Your equity in it, as represented by your reserve commission on the drill is $21.50."

"Your equity in the account is represented by your reserve commission of $67.75."

"You have nearly as much money involved in it now, as we have, inasmuch as there is $166.10 in the amount of reserve payable to you when the first installment is paid."

"Of course too, you have a reserve commission of $166.10 which is payable as soon as this first installment is cleared up and you want your money as badly as we want ours."

"You have approximately $500.00 tied up in this deal and are, of course, interested in seeing the machine stay sold, the same as we are."

"Mr. Johnson did agree * * * that you could continue to deduct your hold backs on collections you made where the payment was in full settlement of the maturing account."

"You have a reserve of $145.50 which will be released as soon as this small balance is taken care of and we believe if you will get in touch with this purchaser, you will have very little difficulty in obtaining this settlement. * * * "

"As soon as we receive the above-mentioned amount, your commission check will go forward promptly."

"Won't you please see this purchaser and get him to settle his account at once? Your commission will be paid the same day we receive the above-mentioned amount."

"We are having to withhold payment of your reserve commission until this small balance is paid us, and we know that you want your money out of it just as badly as we want ours."

"The profits we are able to liquidate for you this year."

"You have a commission of $243.10 in the account, $158.50 of which is payable as soon as this installment is paid."

"Thank you for forwarding purchaser's check for $552.50, together with your check for $1.96 to cover the interest on it.

"This amount, however, does not quite cover accrued interest on the deal, which amounts to $3.77, and leaves a small balance of $1.81 on the interest, which must be cleared up before we will be able to take up your reserve certificate."

On April 14, 1932, the assets of the manufacturer were sold for $270,000.00. Prior to the date of such sale, the Finance Company had remitted the hold backs, when collected, to the dealers entitled thereto. After the sale of the assets of the manufacturer the Finance Company took the position that the dealers had no interest in the commissions or hold backs and that it was entitled to deduct such hold backs from the general indebtedness owing to it by the manufacturer. The dealers thereupon organized the dealer's association, the purpose of which was to effect collection of the commissions due them on retail sales. They circularized purchasers, advising them of the nonpayment of commissions and requesting that full payment be withheld from the Finance Company until the dealers had obtained their commissions. In several instances they instituted garnishment suits against retail purchasers and in other instances, withheld collections they had made to protect their commissions.

The substantive question presented is whether the dealers have beneficial interests to the extent of their respective commissions in the proceeds of the purchaser's paper or whether they have only general claims against the insolvent manufacturer.

By the express terms of the dealer's contracts the obligation to pay the commission arises when the fund comes into existence. While the dealers' contracts do not in so many words provide that commissions when the obligation to pay arises, shall be paid out of the fund, they do contain provisions which indicate an intent to recognize an interest of the dealer in the fund. They provide that upon repossession of merchandise sold, it shall be resold and the balance remaining from such resale shall inure to the benefit of the dealer after pay-

ment of repossession and resale costs and the manufacturer's indebtedness. Each sale was treated as a separate and distinct transaction and the commission to accrue thereon was computed and excluded from the purchase price when the contract and notes covering a sale were transferred to the Finance Company. The contract of January 4, 1929, specifically provides that an amount corresponding to the dealer's commission on each purchase contract transferred, shall be collected by the Finance Company and shall represent the equity of the manufacturer or dealer. While the contract of December 17, 1929, refers to the hold backs as the equity of the manufacturer, it recognizes the interests of the dealers in the commissions by requiring the consent of the dealer concerned, to the acceptance of a partial payment and the extension of the time for the balance where the amount to be collected is not sufficient to warrant the payment of the dealer's commission. The contract of November 7, 1930, recognizes that the commission or hold back belongs to the dealer because it contains a provision permitting the Finance Company, under certain conditions, to apply the hold back on the dealer's indebtedness to it. The order of the court in the receivership proceedings expressly recognizes that the hold backs or commissions belong to the dealers. The Finance Company, by a long course of dealing, recognized the interests of the dealers in the purchaser's contracts and the right of the dealers to receive their commissions when collected by the Finance Company.

■ Where the parties to a contract have given it a practical construction by their conduct, such construction is entitled to great weight in determining its proper interpretation, especially where such practical

---

"Our representative advises us the reason this purchaser held out this amount is due to some repairs that it was necessary for him to purchase for this Combine.

"You of course, realize it is to your advantage to see that this small balance is sent in at once in order that we may release your commission."

"You have a commission of $31.00 tied up in 'this account, which will be released as quickly as the account is closed, which now lacks $6.75 of being paid in full."

"Our balance on this Combine is $675.-00. Deducting your commission of $62.-50 would leave a net of $612.50."

"There. is now due us on the Basil Dennis contract $463.63, which we understand both from our Mr. P. F. Franklin and the Gleaner Combine Harvester Corporation, you were going to send us a check to cover. Your check was to be less the commissions on this deal or $420.83. If you have not already sent your check, we will appreciate receiving it by return mail."

"E. L. Robertson account No. 11932, has paid his account in full. Your reserve certificate of $75.25 is now due and payable and will be paid if you will return it to us."

352

construction occurred before any controversy arose.[2] In Brooklyn L. Insurance Company v. Dutcher, 95 U.S. 269, 273, 24 L.Ed. 410, the court said: "There is no surer way to find out what parties meant, than to see what they have done."

We conclude that the Finance Company holds the commissions collected by it for the benefit of the dealers and that the dealers are entitled to receive such commissions as and when collected by the Finance Company.

The jurisdiction of the court to entertain the counterclaims is challenged because it is said the amount claimed by each dealer is less than $3,000.00. The bill of the Finance Company alleged the requisite jurisdictional facts and gave the court jurisdiction. That being true, the court had jurisdiction over the counterclaims which involve matters directly connected with the matters set up in the bill. New York Life Ins. Co. v. Kaufman (C.C.A. 9) 78 F.(2d) 398, 401; Kirby v. American Soda Fountain Co., 194 U.S. 141, 24 S.Ct. 619, 48 L.Ed. 911.

The Finance Company holds the legal title to the notes and purchase contracts and is entitled to collect them without interference by the dealers. But the Finance Company should promptly remit the commissions to the dealers as collected.

The dealers are entitled to an accounting for commissions heretofore collected by the Finance Company and not paid to them.

The relief granted the Finance Company was proper but it should have been conditioned on the giving of a sufficient bond by the Finance Company to insure prompt payment to the dealers of commissions as and when collected by the Finance Company.

The cause is reversed and remanded with instructions to require the Finance Company to give a bond in an amount to be fixed by the trial court, conditioned that the Finance Company shall promptly remit commissions as and when collected and account for commissions heretofore collected, and to take an accounting of commissions heretofore collected. In the event the Finance Company refuses to give such bond, the injunction should be dissolved. The costs will be assessed against the Finance Company.

On Petition for Rehearing.

PER CURIAM.

In their petition for rehearing, counsel for the Agricultural Bond & Credit Corporation, referred to herein as the Finance Company, assert that in our opinion we misconstrued the dealer's contract with respect to repossessed machines. It is true we referred to paragraph 6 of the dealer's contract, which deals with repossession by the Gleaner Company of machines in the hands of the dealer. However, by paragraph 14 of the dealer's contract the dealer agreed in the event repossession should become necessary to repossess and store and assist in the resale of machines repossessed from purchasers, and paragraph 6 expressly covers used machines. We think this must refer to repossessed machines.

Counsel further assert we overlooked ambiguous provisions in the contract of January 4, 1929. None of the contracts involved are free from ambiguity. We undertook to ascertain their meaning from a consideration of their language, the surrounding facts and circumstances, and the conduct of the parties thereunder.

Counsel further assert that certain of the letters quoted in note 1 of the opinion refer to contracts directly between the dealer and the Finance Company. It is impossible to determine from the record the particular transactions referred to in these letters, but we have no doubt that most of them referred to paper transferred from the manufacturer to the Finance Company. The direct transfers were made by the dealers to the Finance Company in 1928; and these letters were written between August 2, 1929, and July 2, 1931. It is reasonable to assume from the testimony of the vice president and secretary of the Finance Company that most of the letters refer to paper purchased from the manufacturer, since in testifying respecting these letters he said that he had examined them and some of them

---

[2] Lawrence Nat. Bank v. Rice (C.C.A. 10) 82 F.(2d) 28, 33;

Kretni Development Co. v. Consolidated Oil Corporation (C.C.A. 10) 74 F. (2d) 497, 500;

Sternberg v. Drainage District No. 17 (C.C.A. 8) 44 F.(2d) 560;

Brooklyn L. Insurance Company v. Dutcher, 95 U.S. 269, 273, 24 L.Ed. 410;

Lowrey v. Hawaii, 206 U.S. 206, 222, 27 S.Ct. 622, 51 L.Ed. 1026.

referred to paper purchased directly from the dealer by the Finance Company.

 We adhere to our conclusion that the Finance Company holds the commissions collected by it for the benefit of the dealers and that it should account to the dealers therefor.

The last paragraph of the opinion is modified to read as follows:

The cause is reversed and remanded, with instructions to require the Finance Company to give a bond in an amount to be fixed by the trial court, conditioned that the Finance Company shall promptly remit to each dealer commissions as and when collected and account to each dealer for commissions heretofore collected in excess of any indebtedness due from the dealer entitled to the commission to the Finance Company, and to take an accounting of commissions heretofore collected. In the event the Finance Company refuses to give such bond, the injunction should be dissolved. The costs will be assessed against the Finance Company.