Nos. 35,589 and 35,649

ROBERT J. MILLER, *Appellee,* v. COMMERCIAL CREDIT COMPANY, *Appellant.*

(131 P. 2d 716)

Opinion filed December 12, 1942.

*W. D. Jochems* and *J. Wirth Sargent,* both of Wichita, argued the cause, and *Emmet A. Blaes* and *Roetzel Jochems,* both of Wichita, were on the briefs for the appellant.

*Austin M. Cowan* and *Glenn Porter,* both of Wichita, argued the cause, and *C. A. McCorkle, William A. Kahrs, Robert H. Nelson, Getto McDonald, Dwight S. Wallace, William Tinker* and *Arthur W. Skaer,* all of Wichita, were on the briefs for the appellee.

The opinion of the court was delivered by

THIELE, J.: This was a suit for an accounting. The first issue tried in the lower court concerned plaintiff's right to an accounting, and from an adverse judgment the defendant, Commercial Credit Company, a Delaware corporation, appealed. Thereafter a trial was had on the accounting and as to the amount due, and from an adverse judgment the same defendant appealed. The appeals are considered together.

The following statement is made as being conducive to brevity. As originally commenced there were two defendants, Commercial Credit Company of Kansas, against which no judgment was ren-

dered, and it will not be mentioned hereafter, and Commercial Credit Company of Delaware, the appellant here, and which will be referred to as C. C. C. Also mentioned in the pleadings and evidence are the Commercial Credit Trust, a common law trust, hereafter referred to as C. C. T., the Gleaner Combine Harvester Corporation, hereafter referred to as the corporation, and Agricultural Bond and Credit Corporation, hereafter referred to as A. B. C.

We shall not set out in detail the allegations of the pleadings. Generally speaking, the petition alleged that plaintiff and thirty-one others similarly situated who had assigned their rights to him, were dealers in farm machinery, and under contracts with the corporation assigned to it conditional sales contracts hereafter called sales contracts, the corporation paying the dealer certain commissions when the purchaser ultimately paid; that the corporation discounted the sales contracts to A. B. C., which was aware of the commissions or holdbacks due to the dealers, and A. B. C. in turn had assigned the contracts to C. C. T.; that C. C. T. and C. C. C. had collected the commissions and refused to account therefor; that the defendants occupied a fiduciary relation to the plaintiff which was not repudiated until demand for payment was made about January 1, 1940. Reference was also made to an action in the United States District Court of Kansas, wherein A. B. C. sought to enjoin plaintiff from collecting or attempting to collect commissions due. (For brevity reference is made to *Norton v. Agricultural Bond & Credit Corporation,* 92 F. 2d 348, where that litigation was determined.) The prayer was for an accounting and for judgment thereon, etc.

In their answer defendants made certain admissions and denials, and alleged plaintiff's cause of action was barred by the statute of limitations. There was denial that defendants had collected any commissions or holdbacks due to plaintiff or that any fiduciary relationship existed or that the sales contracts were treated as representing a trust fund; and allegations that the sales contracts were assigned to C. C. T. without any information having been given to it as to commissions or holdbacks; that defendants purchased the sales contracts for a valuable consideration, before maturity, relying upon the assignment of the same by plaintiff, and plaintiff should be estopped to claim any interest. There was further allegation plaintiff knew of the transfer of the sales contracts to defendants and that defendants were making collection, instances being alleged, and that prior to August 1, 1935, plaintiff made claim to moneys

collected and defendants refused the demand and advised plaintiff defendants were entitled to all moneys collected; that plaintiff, with knowledge, did not take action until more than five years had elapsed, and in the meantime records and information of the defendants had been lost, and plaintiff should be estopped to ask for an accounting and should be barred by his laches.

At the trial there was a great mass of documentary evidence and considerable oral testimony, dealing primarily with plaintiff's right to an accounting. The defendants filed their request for findings, which the trial court did not adopt. It made twelve findings, which we summarize and quote as follows:

"1. Plaintiff and his assignors were dealers in the sale of combines purchased from the corporation. C. C. T. was a common law trust and transferred practically all of its property to C. C. C. Neither C. C. T. nor C. C. C. obtained a license to do business in Kansas. On February 4, 1931, a receiver was appointed in Missouri for the corporation, etc., and on April 14, 1932, its assets were sold to a new corporation.

"2. Plaintiff and his assignors during the years 1928, 1929, 1930 and 1931 entered into written contracts with the Gleaner Combine Harvester Corporation to sell combines upon commission, which contracts provided that all paper, either conditional sales contracts or notes received by the dealer from purchasers, was to be transferred to the Gleaner Combiner Harvester Corporation, and that as installments were paid the dealer was to receive ten percent as part of his commission. That as sales were made upon conditional sales contracts all contracts were assigned by the purchaser in favor of the dealer and assigned to the Gleaner Combine Harvester Corporation which in turn assigned certain of them to the Agricultural Bond and Credit Corporation of Chicago, and in turn certain of these conditional sales contracts were transferred to Commercial Credit Trust *and Commercial Credit Company of Delaware*.

"3. The Agricultural Bond and Credit Corporation, known as the ABC Company, was a finance company which financed dealers. It purchased conditional contracts as above stated. The ABC Company made collections upon the conditional contracts for itself and on assignment to the Commercial Credit Trust, *and the Commercial Credit Company of Delaware also made collections for these concerns as their agent. Upon other conditional sales contracts collections were made in Kansas by the Commercial Credit Trust and the Commercial Credit Company of Delaware.*"

(4. Refers to a copy of the conditional sales contract and the assignment thereof.)

"5. Under the terms and conditions of the contract between the dealer and the harvester corporation, it was necessary for the dealer to transfer the legal title to the conditional sales contract to the Gleaner Corporation and it was the duty of the Gleaner Corporation *or any assignee thereof* to reserve as holdback out of the collections made ten percent belonging to the dealers.

"6. At the time of the transfer or assignment of the conditional sales con-

tracts to Commercial Credit Trust *and Commercial Credit Company of Delaware, the assignees had knowledge, both constructive and actual, and notice of the rights of the dealers in the ten percent collected upon said conditional sales contracts and had actual knowledge of the claim of the dealers before collections were made by the company or representatives.*

"7. During the receivership in the federal court of Missouri on April 4, 1931, an order was entered directing that ten percent of the collections made on each installment by the ABC Corporation should be held by the receiver for the benefit of the dealers, including the plaintiff and his assignors.

"8. On July 23, 1932, in a suit filed in the United States district court for the district of Kansas at Wichita, the ABC Corporation obtained a restraining order enjoining the plaintiff and his assignors from in any wise interfering with the collection of conditional sales contracts such as are involved in this case which ABC Corporation made attempt to collect. This order was converted into a temporary injunction July 30, 1932, and later made permanent and continued in effect until the mandate of the United States circuit court of appeals of the tenth circuit was spread of record in February, 1938, reversing the order. During this time, plaintiff and his assignors, except in a few cases, were without knowledge as to which of the conditional sales contracts were in the hands of the ABC Corporation for purposes of collection."

(9. Plaintiff did not appear and did not file any claim in the receivership case mentioned in finding No. 1.)

"10. During 1933, Commercial Credit Company of Delaware and Commercial Credit Trust paid plaintiff or allowed him credit for the holdbacks upon two conditional sales contracts which they held and to which the plaintiff was entitled under the terms of his contract with the Gleaner Corporation. And about July of the same year, a representative of these companies who was handling collections in Kansas for them upon the conditional sales contracts stated in substance that 'The chances are they would have to abide by whatever decision was reached in the federal court cases,' meaning the federal court case at Wichita.

"11. In order to make collections on the paper, Commercial Credit Trust and the Commercial Credit Company sent agents into Kansas and opened up separate offices and did make collections upon such contracts.

"12. The contract for the transfer or assignment of sales contracts from the AB&C Corporation to the Commercial Credit Trust or the Commercial Credit Company of Delaware shows that eighty-five percent of the balance due on security instruments was to be paid at the time and the remaining fifteen percent was to be paid pro rata when and as such security instruments were paid. The evidence does not show the actual amount paid. Upon the Commercial Credit Trust or the Commercial Credit Company of Delaware receiving payments on the conditional sales contracts they were returned by them to the purchaser and canceled. They refused, however, through their agent to make any further payments or settlements to the plaintiff or his assignors until the federal court case in Wichita was determined."

Based on those findings, the court concluded as follows:

"1. Conditional sales contracts on which the machinery was sold were non-

negotiable and the defendants, the Commercial Credit Trust and Commercial Credit Company of Delaware, took the same subject to the rights of the plaintiff and his assignors.

"2. The action for an accounting is not barred by the statute of limitations.

"3. Plaintiff is entitled to an accounting from the Commercial Credit Company of Delaware as to all conditional sales contracts surrendered by the Commercial Credit Company of Delaware or the Commercial Credit Trust and as to all contracts where the installments were collected in full."

Thereafter the defendants filed their motion to set aside the findings and conclusions made and substitute those requested by them, or in the alternative to make certain findings more definite and certain, to strike, etc. So far as is necessary to note here the defendants moved to strike the portions italicized as above shown, and all of findings 8, 10, 11 and 12, as well as the conclusions of law. They also filed their motion for a new trial. These motions being denied, the defendants served the first notice of appeal. As has been stated, a second trial was had dealing with the accounting. Defendant's motion for judgment was denied, judgment was rendered for plaintiff, defendant's motion for a new trial was denied, and the second notice of appeal was filed.

The specifications of error pertain to both appeals and cover the matters hereafter discussed.

It is conceded by the appellant that it has received the assets of C. C. T. and that if plaintiff has established a cause of action against C. C. T. then he has an equitable lien on the assets which appellant received. Although appellant says there was not much, if any, dispute in the testimony, it moved to strike out the italicized portions of the findings as noted, as well as all of findings 8, 10, 11 and 12, and in its brief, much space is devoted to those portions and findings. Appellant recognizes that its objections to the portions of findings 2, 3 and 5 are technical and not of themselves decisive of the appeal, but that if finding 6 is supported by the evidence, the plaintiff is entitled to judgment unless he is barred by the statute of limitations or by his laches. We therefore pass discussion of complaints as to findings 2, 3 and 5 and consider finding 6 and especially that portion finding that appellant had knowledge, both constructive and actual, and notice of the dealer's rights in the ten percent collected.

Appellant first complains that the trial court did not set out in some detail the facts showing such knowledge and notice, and argues that the finding is a conclusion of law, and not of fact. We are of

opinion the finding is of an ultimate fact and so examine the record to determine whether appellant's contention it is not supported by the evidence is correct.

There is no dispute but that under the dealer's contract with the corporation, upon a sale being made on deferred payments, the dealer made an absolute assignment of the sales contract to the corporation, which, upon making collection, paid to the dealer the portion due to him, as his commission. Nor is there any substantial dispute but that when the corporation assigned the contracts to A. B. C. it was done under a contract of January 4, 1929, which expressly recognized the dealer's rights in commissions and for their payment. As bearing on this phase, see the opinion in *Norton v. Agricultural Bond and Credit Corporation*, 92 F. 2d 348. It further appears that upon the contracts being assigned to it, A. B. C. set up separate ledger cards showing the name of the purchaser, name of the dealer, the machine sold, the discount, amount of holdback and commission, etc.

Under date of May 20, 1930, A. B. C. entered into a contract with C. C. T. whereby the first party proposed to sell and the second party proposed to buy approximately one million dollars' worth of "security instruments," the contract making no reference to who were the makers or original holders, or that 'the property covered was of any particular type. Under this contract C. C. T. was to pay one hundred percent of the unpaid balance due, less certain interest charges, it being agreed that eighty-five percent of the purchase price should be paid at the time of the purchase of the security and fifteen percent when the security was paid by the maker. Without going into further detail, it may be said there were provisions that A. B. C. should make collections for C. C. T. on the purchased securities; that A. B. C. warranted the securities as not being subject to any defenses, offsets or counterclaims; that A. B. C. should execute assignments so as to vest all its right, title and interest to C. C. T. and giving C. C. T. the right to inspect, make abstracts from and examine fully all books and records of A. B. C. relating to the security instrument. Under this contract, there was no liability until a purchase was actually made.

About February 4, 1931, the Gleaner corporation was placed in receivership in Missouri, and on April 4, 1931, the court made an order directing the receiver to pay the dealers their commissions. About December 1, 1931, C. C. T. took over from A. B. C. collection

of the securities purchased, and in the following spring set up an organization at Wichita to make collections thereon. All collections involved were made after the latter date. It appears from the record that under the above contracts C. C. T. purchased sales contracts originally assigned by the corporation or the receiver thereof to A. B. C. of the face amount of over $165,000. It does not appear definitely how many contracts were assigned before and how many were assigned after the receiver was appointed for the corporation. That the dealers had an interest in all of the contracts is not disputed.

Fraser, a witness for defendant, who was the vice-president of C. C. C. and had been the vice-president of C. C. T. and on its behalf had executed the contract with A. B. C., testified in detail as to the purchase of securities. Briefly, he stated A. B. C. would from time to time furnish the securities to be sold, which on their face did not show the unpaid balance, with a schedule showing name, date of contract, balance due thereon, etc., and that C. C. T. would thereupon pay A. B. C. eighty-five percent of such balance due. He further testified he learned as early as 1932 of the dealer's claim; that the records of C. C. T. had been lost and he had searched for such records and could not find the schedules, the checks issued to pay A. B. C., nor any ledger accounts. He was unable to state the items or amounts of any schedules, and when confronted with the A. B. C. ledger cards or copies thereof, which had passed into the hands of C. C. T. he was unable to state what amount was paid for any particular contract.

Heaton, a witness for defendant, who had been an employee and later secretary of C. C.T., likewise testified to the method followed when C. C.T. acquired the sales contracts from A. B. C.; that the schedules were destroyed; that he had searched for canceled checks, ledgers, etc., showing the transactions, and could not find anything but the ledger cards.

Peters, a witness called by plaintiff, testified he was an employee of C. C. T. in 1930, 1931 and 1932, and was with one Abrams in the collection office set up in Wichita. He was asked concerning an exhibit which contained an abstract of the various sales contracts and the history of what was done with each, and on being asked about a particular sales contract stated the information showing holdbacks of commission was taken from the original ledger card received from A. B. C. when C. C. T. acquired the paper. Other particular

sales contracts were called to his attention and a like answer given. A recess was then taken, and when the witness resumed the stand he volunteered the statement that he thought the questions were directed to his connection with taking over the cards in 1932. Further examination disclosed that during the recess the matter had been discussed with attorneys. Thereafter he fixed the date as June, 1932, and not when the sales contracts were acquired, as the date the ledger cards came to his attention. Appellant insists the witness had made an inadvertent statement and that his correcting statement should control, while appellee insists that the question of when he was to be believed was for the court. We here note that outside of the above there was no specific evidence when C. C. T. did first examine or get possession of the ledger cards. We are of the opinion that in view of the trial court's finding the matter of this oral testimony may not be entirely isolated from the other oral and the documentary evidence, for it had the right to draw reasonable inferences from all of the evidence, only a part of which is mentioned above. We cannot search the trial court's mind and determine what weight it gave to the fact the contract between A. B. C. and C. C. T. gave the latter the right to investigate the books and records of A. B. C., which concededly showed the holdbacks of commissions; that Fraser testified they purchased solely on schedules, taking the representations of A. B. C. as true without investigation; his or Heaton's explanation why the schedules, canceled checks, etc., were permitted to be destroyed or lost although C. C. T. was aware as early as 1932 that the dealers were making claims; the inability of Fraser or anyone else to state what C. C. T. paid for any particular contract, or to show whether it was purchased before or after a receiver had been appointed for the corporation, or when confronted by the card dealing with a particular sales contract to state what the balance due was when C. C. T. claimed to have acquired it and what it paid therefor. We cannot say from the record as it appears in the transcript, which we have carefully examined, and from the documentary evidence introduced, that the trial court's conclusions of fact as expressed in finding 6 are without support in the evidence.

Although complaint is lodged against finding of fact 12, the complaint particularly seems to be against that part stating the evidence does not show the exact amount paid by C. C. T. Without going into any detail, we think the evidence above mentioned shows a sound basis for the conclusion.

In view of our opinion as above expressed, it becomes unnecssary to discuss other contentions in the briefs dealing with the merits of plaintiff's cause of action.

We next consider appellant's contention the plaintiff is barred from maintaining the action by the statute of limitations and by his laches. The gist of this contention is that the contract of purchase between A. B. C. and C. C. T. was made in May, 1930, the sales contracts were purchased between then and December 1, 1931, and the evidence of both plaintiff and defendant disclosed that when defendant started collection on the sales contracts in 1932 plaintiff was advised of defendant's ownership and its denial of plaintiff's rights. Defendant argues plaintiff could have commenced his action as well then as later. Defendant also calls attention to *Norton v. Agricultural Bond & Credit Corporation,* supra, pleaded by plaintiff in his petition, and relying on *City of Hutchinson v. Hutchinson,* 92 Kan. 518, 141 Pac. 589, and cases cited, argues an injunction in an action between two parties has no effect between one of the parties and another who was not a party to the suit, and that therefore the injunction granted in the Norton case, *supra,* was not effective to prevent an action between the present plaintiff and defendant. The matter does not seem so simple to us. The contract of May 20, 1930, whereby C. C. T. was to purchase from A. B. C. made the latter the collecting agent of the former as to any sales contracts purchased. While there is some testimony that C. C. T. took over collection on December 1, 1931, the evidence showed that it did not start to perfect its arrangements to collect until sometime in the spring of 1932. In July, 1932, the A. B. C., conceiving that the dealers were interfering with its collections, brought suit in the federal district court in Kansas and obtained an injunction against interference which stood until reversed in the circuit court of appeals in the latter part of 1937. The present action was timely filed after the latter date. We do not agree the evidence of both parties shows that plaintiff knew C. C. T. owned the sales contracts now involved. Without reviewing the evidence, the most favorable view to the appellant is that it was in conflict. There was some evidence that plaintiff did know about two contracts and that C. C. T. paid him the commissions due, as shown by finding 10. We are not disposed to place weight on the statement attributed to the C. C. T. representative in that finding largely for the reason the evidence as to his authority is quite scant.

Not much space need be devoted to the appellant's contention that although it was a foreign corporation, it was amenable to suit for the reason it was "authorized to do business in the state" as those words are used in the statute of limitations (G. S. 1935, 60-309). (*Doherty v. Kansas City Star*, 143 Kan. 802, 57 P. 2d 43.) As shown by finding 1, C. C. T. had not obtained a license to do business in Kansas. There was no evidence it was engaged in interstate commerce within the state of Kansas. The record discloses the action grew out of sales contracts having their origin in this state, and defendant's effort to collect and in the collection of amounts due thereon. We think the case is governed by *Weishaar v. Butters Pump & Equipment Co.*, 149 Kan. 842, 89 P. 2d 864, wherein it was held:

"A foreign corporation not authorized to do business in Kansas, and which has not designated an agent in this state on whom service of judicial process on it may be effected, but which became obligated for sums of money arising out of business transactions which occurred in this state, is not entitled to plead the statute of limitations in defense to an action by plaintiff to recover thereon." (Syl.)

Without further discussion we conclude the plaintiff's cause of action was not barred by any statute of limitations or by his own laches.

The judgment of the trial court is affirmed.