**In re SUNLAND, INC., Debtor.**

**No. 7–13–13301 TR.**

United States Bankruptcy Court,
D. New Mexico.

Signed March 25, 2014.

Opinion Denying Reconsideration
March 27, 2014.

Aletheia V.P. Allen, Mark W. Allen, Arland & Associates LLC, Albuquerque, NM, William J. Arland, III, Santa Fe, NM, for Debtor.

Clarke C. Coll, pro se, Roswell, NM, Thomas D. Walker, Leslie D. Maxwell, Walker & Associates, PC, Albuquerque, NM, for Trustee.

Victor E. Carlin, Steven J. Hile, Moses, Dunn, Farmer & Tuthill, PC, Albuquerque, NM, Rod O'Donoghue, William P. Pinna, Matthew S. Black, Pinna Johnston & Burwell, PA, Raleigh, NC, Aaron G. York, Ryley Carlock & Applewhite, PC (by phone) for Hampton Farms of NM, LLC.

Alice N. Page, Office of U.S. Trustee, Albuquerque, NM, for U.S. Trustee.

Chris W. Pierce, Albuquerque, NM, for R&L Peanut Co. Inc.

David J. Giddens, Fisher & Phillips LLP, Dallas, TX, for Costco Wholesale Corp.

Edward A. Mazel, Askew & Mazel, LLC, Albuquerque, NM, for Tifton.

Patricia Bradley, Albuquerque, NM, for Berlin Packaging, LLC.

John J. Hall, Brian D. Bouquet, Lewis, Rice & Fingersh, LC, St. Louis, MO, for Golden Boy/Post Holding.

Gail Gottlieb, Michelle K. Ostrye, Katharine C. Downey, Sutin, Thayer & Browne, APC, Albuquerque, NM, for Production Credit Association of Southern New Mexico, a wholly owned subsidiary of Farm Credit of New Mexico, ACA.

Paul M. Fish, Modrall Sperling, Albuquerque, NM, for CoBank, ACB.

Wesley O. Pool, Pool Law Firm, PC, Clovis, NM, for Newman Electric Corp. (by phone).

## MEMORANDUM OPINION

DAVID T. THUMA, Bankruptcy Judge.

The Chapter 7 trustee put together auction procedures to facilitate the sale of Sunland's peanut butter manufacturing plant in Portales, New Mexico. Two bidders emerged, and an auction was held March 20, 2014. A hearing to approve the sale to the high bidder, Hampton Farms, LLC ("Hampton"), was held March 21, 2014. Right before the hearing, the trustee received a call from Golden Boy Foods, Ltd. ("Golden Boy") offering to pay an extra $5 Million for the assets. The Court therefore must consider what to do with the sale given the unexpected, last-second upset bid.

### I. FINDINGS OF FACT

The Court finds the following facts:

The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is proper in the Court under 28 U.S.C. §§ 1408 and 1409.

On October 9, 2013, Sunland, Inc. filed a voluntary petition under Chapter 7 of the Bankruptcy Code. Clarke C. Coll was appointed and is duly qualified and acting Chapter 7 trustee in this case ("Trustee"). During the months following the bankruptcy filing, the Trustee met with a number of potential buyers in an effort to sell most of the tangible assets of the estate (the "Acquired Assets").

On January 31, 2014, the Trustee filed a Motion For Orders (A) Authorizing Sale of Assets Free and Clear of All Liens, Claims and Interests, Subject to Higher and Better Offers, (B) Establishing Bidding Procedures, (C) Approving Break–Up Fee, and (D) Approving Surcharge For Trustee's Fees, Commission, And Costs (the "Motion"). By his Motion, the Trustee sought to establish a procedure under which he would sell the Acquired Assets to Ready Roast Nut Company, LLC ("Ready Roast") or any successful bidder at an auction of the assets. Under the proposed procedures, if the Trustee received one or more "Qualified Bids" from parties other than Ready Roast, then the Trustee would conduct an auction of the Acquired Assets and sell them to the high bidder, subject to Court approval. The Trustee sent notice of the Motion, including information regarding the auction, to all parties who expressed an interest in purchasing the Acquired Assets. He also advertised the sale in several national newspapers and trade journals.

On March 5, 2014, Hampton submitted a Qualified Bid to purchase the Acquired Assets. Hampton was the only party to submit such a bid. Shortly thereafter, the Court entered a stipulated order authorizing the sale of the Acquired Assets and adopting the Bidding Procedures attached to the Motion (the "Sale Order"). The Bidding Procedures set forth the requirements for bidding on the Acquired Assets at auction. The Sale Order and Bidding Procedures make clear that any sale is subject to Court approval, and that such approval must include a finding that the successful bid provides the highest or otherwise best value for the Acquired Assets and is in the best interest of the estate.

An auction of the Acquired Assets was conducted on March 20, 2014. Ready Roast and Hampton participated in the auction. A total of 14 bids were made by Ready Roast and Hampton, beginning at $17,475,000. Hampton was the high bidder, with a bid of $20,050,000. Ready Roast was the back-up bidder, with a bid of $20,000,000. After the auction, Hampton and Ready Roast each executed amendments to their respective asset purchase

agreements to amend the purchase price consistent with the auction.

The Court held a hearing on March 21, 2014 to determine whether to approve the sale of the Acquired Assets to Hampton for $20,050,000. Shortly before the hearing the Trustee received a telephone call from Paul Henderson of Golden Boy, offering to buy the Acquired Assets on the same terms and conditions as Hampton, for $25,000,000. After hearing arguments of counsel and the representations of the Trustee, the Court continued the hearing until March 24, 2014.

At the continued hearing, Mr. Henderson testified regarding the events leading up to the last-second upset bid. Golden Boy became interested in purchasing the Acquired Assets shortly after learning of Sunland's bankruptcy filing. At the time, Golden Boy was owned by Tricore Pacific Capital, Inc. In early November 2013, Mr. Henderson visited Sunland's plant to conduct due diligence in connection with the sale of the Acquired Assets. He recommended to Tricore that Golden Boy seeks to purchase the Acquired Assets. Tricore, however, did not want to pursue the acquisition because it was in the process of selling Golden Boy to Post Holdings, Inc. ("Post"). Upon learning that Tricore did not want Golden Boy to proceed, Mr. Henderson asked the Trustee if he would be willing to postpone the sale process for a short period of time. Because of substantial time and economic pressures, the Trustee declined to do so. Shortly thereafter, Mr. Henderson notified the Trustee that Golden Boy was unable to pursue the potential acquisition, but urged him to stay in touch regarding the progress of the sale.

Post completed its acquisition of Golden Boy on or about February 1, 2014. Four days later, the Trustee e-mailed a notice concerning the auction sale of the Acquired Assets to Richard Harris, the President and CEO of Post Private Brands Group.[1] The notice stated that the deadline to bid on the Acquired Assets was March 5, 2014.

When Mr. Harris received the February 5, 2014 e-mail, things were rather chaotic at Golden Boy. He was very busy acquainting himself with his new responsibilities and coworkers at Post. Mr. Harris forwarded the notice to Mr. Henderson, although it is unclear whether this occurred within a few days of receipt or at a later date. Regardless, it is safe to conclude that Golden Boy had notice of the auction sale, but also that the notice was not given sufficient attention because the Post acquisition had just closed.

Around this time Mr. Henderson read a story on the internet that led him to believe (wrongly) that Ready Roast had purchased the Acquired Asserts. He continued to believe that until March 18 2014, when another Golden Boy employee sent him an article about the scheduled March 20, 2014 auction.

Mr. Henderson and Mr. Harris immediately set out to obtain corporate authority to bid on the Acquired Assets. Mr. Henderson thought there was very little chance Golden Boy would be able to obtain the necessary authority from Post, but it turned out that Mr. Harris was able to do so.

Once corporate authority was obtained, Mr. Henderson tried to contact the Trustee. He called the Trustee on the morning of March 21, 2014 and left a voicemail message on the Trustee's office telephone in Roswell, New Mexico. The Trustee was in Albuquerque at the time, preparing for

---

1. Prior to the acquisition by Post, Mr. Harris     was the President and CEO of Golden Boy.

the hearing to approve the sale to Hampton.

Golden Boy did not actually speak to the Trustee until about 1:30 p.m. on March 21, 2014, at which time it conveyed its upset bid offer. The following Monday, Golden Boy wiretransferred $25 million to Graham Title Company in Portales, New Mexico. Golden Boy also executed an asset purchase agreement, which is nearly identical to the agreements executed by Ready Roast and Hampton. If Golden Boy is allowed to buy the Acquired Assets, it is prepared to close on March 28, 2014. Golden Boy intends to process and manufacture peanuts and peanut butter at the plant.

Ready Roast, Hampton, Golden Boy, and the Trustee participated in all aspects of the sale process in the utmost good faith. Golden Boy's failure to submit a timely qualified bid and participate in the March 20, 2014 auction was the result of Mr. Henderson's mistaken belief that the assets had already been sold. Golden Boy did not act with any improper motive in submitting the upset bid when it did, or in failing to participate in the auction.

CoBank, PCA, and Costco also participated in all aspects of the sale process in the utmost good faith. There was no collusion or other improper behavior on the part of the Trustee, Ready Roast, Hampton, Golden Boy, CoBank, PCA, Costco, or any other party in interest. The March 20, 2014 auction was conducted in a regular manner in accordance with the Sale Order and Bidding Procedures.

An additional $5,000,000 would mean a lot to the bankruptcy estate. The evidence on facts such as administrative solvency, payment of secured claims from the auction sale proceeds, and the ultimate distribution, if any, to unsecured creditors is imprecise, but there is no dispute that the additional funds from Golden Boy's upset bid would very substantially benefit creditors, particularly unsecured creditors.

The Trustee is eager to close the sale by March 28, 2014. The Acquired Assets include peanuts, which are perishable and lose value over time. In addition, the farmers in the Portales, New Mexico area, many of whom are creditors of the estate, are awaiting the outcome of the sale to decide whether or not to plant peanuts in early April.

## II. *DISCUSSION*

The Trustee has presented the Court with the results of a judicial auction along with a higher upset bid that was made one day later. He is torn between his desire to honor the auction results and his duty to maximize the value of the estate for the benefit of the creditor body. The Trustee has asked the Court for guidance whether he is bound to proceed with the sale to Hampton.

### I. *11 U.S.C. § 363*

■ Section 363(f) permits a trustee, after notice and a hearing, to sell estate property free and clear of interests in the property. Bankruptcy trustees are entitled to use their discretion and business judgment in determining how to conduct sales under § 363. *In re Buerge,* 479 B.R. 101, 106 (Bankr.D.Kan.2012) ("The trustee is granted wide discretion in the conduct of the sale"); *In re Psychrometric Sys. Inc.,* 367 B.R. 670, 674 (Bankr.D.Colo.2007) (same); *In re Schipper,* 933 F.2d 513, 515 (7th Cir.1991) (the trustee, in exercising her fiduciary duties, must articulate a business justification for a sale).

### II. *Court Discretion in Light of a Post–Sale Overbid.*

■ Bankruptcy courts are afforded wide latitude in deciding whether to ap-

prove § 363 sales. *In re Bakalis,* 220 B.R. 525, 532 (Bankr.E.D.N.Y.1998); *Buerge,* 479 B.R. at 106. Although the Court cannot choose between competing bids, it does "have the power to disapprove a proposed sale recommended by a trustee ... if it has an awareness there is another proposal in hand which, from the estate's point of view, is better or more acceptable." *In re Broadmoor Place Inv., L.P.,* 994 F.2d 744, 746 (10th Cir.1993). This is true even if the trustee has entered into an agreement with a buyer for the sale of an asset at a particular price. As the Tenth Circuit explained, calling such an agreement a "contract" would be "a misnomer since there can be no contract in this situation without Bankruptcy Court approval." *Id.* at 745 n. 1. In reality, such agreements "are ... binding bids." *Id. See also Catalina Development, Inc. v. Bernard R. Given II (In re Crowder),* 397 B.R. 544, 2008 WL 4228382, at *7 (10th Cir.BAP 2008) (unpublished) ("[A]bsent court approval, an agreement to sell estate property outside the ordinary course of business is not a binding contract.").

The Tenth Circuit has not directly addressed the issue of whether, and under what circumstances, a bankruptcy court can disapprove a regularly conducted § 363 auction sale and reopen bidding because of a late upset bid. In considering this issue, other circuits typically weigh two competing considerations: the best interests of creditors and the integrity and finality of judicial auctions. *See, e.g., Corporate Assets, Inc. v. Paloian,* 368 F.3d 761, 767 (7th Cir.2004); *In re Food Barn Stores, Inc.,* 107 F.3d 558, 562 (8th Cir. 1997); *In re Financial News Network Inc.,* 980 F.2d 165, 166 (2nd Cir.1992); *First Nat'l Bank v. M/V Lightning Power,* 776 F.2d 1258, 1259 (5th Cir.1985); *cf.*

*Cargill Inc. v. Charter Int'l Oil Co. (In re Charter Co.),* 829 F.2d 1054, 1055 n. 1 (11th Cir.1987). "[T]he governing principle at a confirmation proceeding is the securing of the highest price for the bankruptcy estate. A central purpose of bankruptcy, after all, is to maximize creditor recovery." *Paloian,* 368 F.3d at 767 (citation omitted). *See also In re C.W. Mining Co.,* 636 F.3d 1257, 1265 (10th Cir.2011) (noting that the major purpose behind bankruptcy law is "maximizing the value of the estate for its creditors"); *In re Mundy Ranch, Inc.,* 484 B.R. 416, 422 (Bankr. D.N.M.2012) (The purpose behind a § 363(f) sale is "to maximize the value of the asset, and thus enhance the payment made to creditors.") (internal quotations omitted).

On the other hand, "[r]efusing to confirm a sale to a high bidder merely because an intervening higher bid has been received is the surest way to destroy confidence in judicial sales ...." *J.J. Sugarman Co. v. Davis,* 203 F.2d 931, 932 (10th Cir.1953). *See also In re Gil–Bern Industries,* 526 F.2d 627, 628 (1st Cir.1975) (noting that "it is important that the bidder receive what he had reason to expect, and that nothing impair public confidence in the regularity of judicial sales"). This concern can be ameliorated if the court acts consistently with the rules governing the sale "and in compliance with the bidders' reasonable expectations." *Food Barn,* 107 F.3d at 565.

■ Walking the tightrope between upholding orderly judicial sales process and ensuring the greatest return to creditors, courts facing similar situations have considered: (1) the applicable bidding procedures and the reasonable expectations of bidders based on those procedures;[2] (2)

**2.** *See Paloian,* 368 F.3d at 766 (examining the bidding procedures, among other things, to determine whether to reopen bidding to consider a higher upset bid); *In re Bigler, LP,* 443

the amount of the overbid and the impact on creditors;[3] (3) whether the new bidder acted in good faith;[4] and (3) whether a sale order has been entered.[5]

■ A. *Bidding Procedures and the Parties' Reasonable Expectations.* The Sale Order and Bidding Procedures clearly contemplate a sale to the successful bidder at the March 20, 2014 auction. Nevertheless, the language in those documents placed Hampton on reasonable notice that the auction results could be rejected by the Court. The Sale Order reserves for further determination by the Court "[a]pproval of the sale of the Acquired Assets to [Ready Roast] ... or a party other than Ready Roast for a higher and better offer." Sale Order, ¶ 9. The Bidding Procedures require the Court to scrutinize the auction results to determine whether "consummation of the sale contemplated by the successful bid will provide the highest or otherwise best value for the Acquired Assets and is in the best interests of the estate." Bidding Procedures, ¶ K. They

also specify that acceptance of the highest bid by the Trustee "is conditioned upon approval by the Bankruptcy Court of the successful bid and entry of a sale order approving such successful bid." *Id.* The Trustee further reserved the right to reject a Qualified Bid or adjourn hearing on final approval of the sale if he determines that accepting a particular bid is contrary to the best interests of the estate. *Id.* at ¶ P.

B. *The Amount of the Overbid and Impact on Creditors.* The amount of Golden Boy's overbid is too high for the Court to ignore. Golden Boy has agreed to pay $4,950,000 more than Hampton. That bid is approximately 25% higher than Hampton's current bid of $20,050,000.[6] Golden Boy has not conditioned its bid on any terms or conditions that might make Hampton's bid more appealing, notwithstanding the lower price. As Golden Boy transferred the entire $25 Million to a title company, in the form of a nonrefundable deposit, and sent representatives from

B.R. 101, 112–113 (Bankr.S.D.Tex.2010) (refusing the open bidding after determining the bidding procedures clearly foreclosed the possibility of the party submitting a higher, last-minute bid).

3.  *See Food Barn,* 107 F.3d at 567 n. 16 (suggesting that courts who refuse to consider a substantially higher bid risk being "dereliction in its duty to guarantee that the particular assignment was in the best interest of the estate and the unsecured creditors"); *Gil–Bern Industries, Inc.,* 526 F.2d at 629 (bankruptcy court abused its discretion by refusing "to confirm an adequate bid received in a properly and fairly conducted sale merely because a *slightly higher offer* has been received after the bidding is closed") (emphasis added); *In re Muscongus Bay Co.,* 597 F.2d 11, 12–13 (1st Cir.1979) (affirming bankruptcy court's decision to consider a higher upset bid where the "estate gained a 21.5% Price increase by the extension of the bidding period").

4.  *See Bigler,* 443 B.R. at 109–110 (declining the reopen bidding where the movant participated in the first auction but waited until the successful bidder had already expended substantial time and efforts towards purchasing the assets to submit a higher upset bid).

5.  *Paloian,* 368 F.3d at 768 (noting that "[o]nce a court has confirmed the sale of the debtor's assets to the auction's victor, ... only a narrow range of circumstances will support a court's decision to vacate the sale order and reopen the bidding"); *Food Barn,* 107 F.3d at 565 ("At some point, such as when the court actually enters an order approving the sale, expectations become sufficiently crystallized so as to render it improper to frustrate anticipated results except in the limited circumstances where there is a grossly inadequate price or fraud in the conduct of the proceedings.").

6.  The percentage increase is either 24.7% or 25.3%, depending upon whether the "break-up" fee is taken into account.

Canada to the continued hearing on short notice, it is unlikely they would pull out of the sale.

In cases involving such a significant percentage increase, courts have been inclined to reopen an auction to consider the higher bid. *See, e.g., Muscongus Bay Co.,* 597 F.2d at 12–13 (affirming bankruptcy court's decision to consider a new bid, which was 21.5% greater than the initial successful bid); *Food Barn,* 107 F.3d at 564 (affirming decision to reopen bidding where later bid was 31% greater); *In re GGSI Liquidation, Inc.,* 280 B.R. 425 (N.D.Ill.2002), aff'd, 368 F.3d 761 (7th Cir. 2004) (decision to consider later bid that was 16% higher than the winning bid at the auction was not an abuse of discretion).

The Trustee testified that, if the Acquired Assets sell for $20,050,000, there is some risk that certain types of unsecured creditors will receive a negligible distribution.[7] Based on the Trustee's testimony regarding the Debtor's assets and liabilities, the Court is inclined to agree. A sale to Hampton at its current bid price may only cover the secured, administrative, and priority claims against the estate, whereas a sale to Golden Boy for $25 million would ensure that unsecured creditors receive most of the additional $4,950,000. Although the Court is sympathetic to Hampton's situation, it must also consider the unsecured creditors in this case, many of whom suffered significant setbacks in their businesses or farms as a result of Sunland's bankruptcy.

C. *The Good Faith of the Overbidder.* Hampton argues that Golden Boy submitted the last-minute upset bid in an attempt to gain an unfair advantage in the sale process. This argument is unconvincing. If anything, re-entering the sale process at the last minute (literally) probably put Golden Boy at a disadvantage. The bidding opened in this case at $17,475,000 and ultimately reached $20,050,000. Had Golden Boy participated in the auction process from the beginning, it may have been able to purchase the Acquired Assets for less than $25 Million. Instead, Golden Boy was required to overbid by nearly $5 million, immediately wire $25 million to a trust account in the form of a nonrefundable deposit,[8] and fly its representatives to Albuquerque to testify in order for the Trustee to consider its proposal. Further, by entering the process late, Golden Boy was deprived of the opportunity to draft the Bidding Procedures and purchase agreements. The Court is therefore convinced that Golden Boy acted in good faith and was not "lying in the weeds" to obtain a tactical advantage.

■ D. *No Sale Order Entered.* Finally, no order approving the sale to Hampton Farms was entered. Had one been entered, it would have been far more difficult to consider a later bid. *Paloian,* 368 F.3d at 768; *Food Barn,* 107 F.3d at 565. Where-as here-the upset bid was made at the final sale hearing, before entry of an order approving the sale, the Court may use its discretion under § 363 to disapprove the sale. *See Broadmoor Place,* 994 F.2d at 746 (the Court has discretion to disapprove a sale if it becomes aware of a better, more acceptable proposal).

---

**7.** Unsecured creditors holding claims relating to the recall of the Debtor's peanut products may be receive additional insurance proceeds. The individuals who will feel the greatest impact of the additional $5 million are the local farmers and business owners who hold unsecured, non-priority claims that are not directly related to the recall.

**8.** Hampton was only required to make a $1 Million nonrefundable deposit.

### III. *CONCLUSION*

Hampton argues that reopening the auction would be inherently unfair and undermine the integrity of the judicial process. Although the Court is loath to disturb the results of a judicial auction, this reluctance is counterbalanced by the amount of Golden Boy's overbid and the fact that the bidding procedures put Hampton on notice that the auction was subject to Court approval. Given Golden Boy's $25 million upset bid, the Court cannot make a finding that the sale to Hampton is in the best interests of the estate. The Court will therefore deny the Trustee's motion to approve the sale to Hampton for $20,050,000, and will reopen bidding, starting with Golden Boy's $25 Million bid. The Court will enter a separate order consistent with this memorandum opinion.

### *MEMORANDUM OPINION ON HAMP-TON FARMS, LLC'S EMERGENCY MOTION FOR RECONSIDERA-TION, ETC.*

This matter came before the Court on Hampton Farms, LLC's ("Hampton's") Emergency Motion for Reconsideration of Court's Order (doc 402), Request for Stay Pending Appeal, Grant Leave for Interlocutory Appeal, and for Equitable Relief, doc. 403 (the "Motion for Reconsideration and Stay"). The Motion for Reconsideration and Stay relates to the Court's Memorandum Opinion, doc. 401 ("Memorandum Opinion") and Order Denying Motion to Approve Sale, Reopening Auction, and Setting Final Hearing on Motion to Sell, doc. 402 ("Order"), both entered March 25, 2014.

By its Motion for Reconsideration and Stay, Hampton seeks the following relief:

   a. Reconsideration of the rulings set forth in the Memorandum Opinion and Order;

   b. An order staying any consummation of the sale to Golden Boy Farms, Ltd. ("Golden Boy");

   c. Leave to file an interlocutory appeal of the Order; and

   d. For the Court to exercise its equitable powers and award Hampton $500,000 from the proceeds of the sale of estate assets to Golden Boy.

The Court held a final hearing on the Motion for Reconsideration and Stay on March 26, 2014. After considering the Motion for Reconsideration and Stay and the arguments of counsel, and being otherwise sufficiently informed, the Court denies the requested relief for the reasons set forth below.

### I. *BACKGROUND AND PROCEDURAL HISTORY*

On October 9, 2013, Sunland, Inc. filed a voluntary petition under Chapter 7 of the Bankruptcy Code. Clarke C. Coll was appointed and is duly qualified and acting Chapter 7 trustee in this case ("Trustee"). During the months following the bankruptcy filing, the Trustee met with a number of potential buyers in an effort to sell most of the tangible assets of the estate (the "Acquired Assets").

On January 31, 2014, the Trustee filed a Motion For Orders (A) Authorizing Sale of Assets Free and Clear of All Liens, Claims and Interests, Subject to Higher and Better Offers, (B) Establishing Bidding Procedures, (C) Approving Break–Up Fee, and (D) Approving Surcharge For Trustee's Fees, Commission, And Costs (the "Motion"). By his Motion, the Trustee sought to establish a procedure under which he would sell the Acquired Assets to Ready Roast Nut Company, LLC ("Ready Roast") or any successful bidder at an auction of the assets. Under the proposed procedures, if the Trustee received one or

more "Qualified Bids" from parties other than Ready Roast, then the Trustee would conduct an auction of the Acquired Assets and sell them to the high bidder, subject to Court approval. The Trustee sent notice of the Motion, including information regarding the auction, to all parties who expressed an interest in purchasing the Acquired Assets. He also advertised the sale in several national newspapers and trade journals.

From the time he filed the Motion until now, the Trustee has always emphasized the need for a speedy sale of the Acquired Assets. Per the terms of the Ready Roast agreement, the Trustee required a closing date of March 28, 2014. Hampton and Golden Boy all agreed to this deadline.

On March 5, 2014, Hampton submitted a Qualified Bid to purchase the Acquired Assets. Hampton was the only party to submit such a bid. Shortly thereafter, the Court entered a stipulated order authorizing the sale of the Acquired Assets and adopting the Bidding Procedures attached to the Motion (the "Sale Order"). The Bidding Procedures set forth the requirements for bidding on the Acquired Assets at auction. The Sale Order and Bidding Procedures make clear that any sale is subject to Court approval, and that such approval must include a finding that the successful bid provides the highest or otherwise best value for the Acquired Assets and is in the best interest of the estate.

An auction of the Acquired Assets was conducted on March 20, 2014. Ready Roast and Hampton participated in the auction. A total of 14 bids were made by Ready Roast and Hampton, beginning at $17,475,000. Hampton was the high bidder, with a bid of $20,050,000. Ready Roast was the back-up bidder, with a bid of $20,000,000. After the auction, Hampton and Ready Roast each executed amendments to their respective asset purchase agreements to amend the purchase price consistent with the auction.

The Court held a hearing on March 21, 2014 to determine whether to approve the sale of the Acquired Assets to Hampton for $20,050,000. Shortly before the hearing the Trustee received a telephone call from Paul Henderson of Golden Boy, offering to buy the Acquired Assets on the same terms and conditions as Hampton, for $25,000,000. After hearing arguments of counsel and the representations of the Trustee, the Court continued the hearing until March 24, 2014.

At the continued hearing, the Court heard testimony from the Trustee and a representative of Golden Boy, admitted several exhibits into evidence, and heard extensive arguments of counsel. The Trustee sought guidance from the Court as to whether he was bound to proceed with the Hampton offer, or was free to pursue a sale to Golden Boy for $25,000,000.

The morning of March 25, 2014, the Court entered the Memorandum Opinion and Order disapproving the sale to Hampton for $20,050,000, ruling that the sale to Hampton could not be approved as being in the best interests of the estate. The Court reopened the auction for further bidding among Golden Boy, Hampton, and Ready Roast, with Golden Boy's opening bid of $25,000,000. Hampton filed the Motion for Reconsideration and Stay later that afternoon.

At the reopened auction, Golden Boy was the high bidder at $26,000,000, topping Hampton's bid of $25,100,000.

## II. *DISCUSSION*

### A. *The Motion for Reconsideration.*

■ Depending on when the motion is filed and the type of relief sought, courts construe motions to reconsider under ei-

ther Fed.R.Civ.P. 59(e) (motion to alter or amend a judgment) or Fed.R.Civ.P. 60(b) (relief from judgment). *Commonwealth Property Advocates, LLC v. Mortgage Electronic Registration Systems, Inc.*, 680 F.3d 1194 (10th Cir.2011). Since the Motion was filed one day after the Memorandum Opinion and Order were entered, the Court will construe it as a motion to alter or amend the judgment pursuant to Fed. R.Civ.P. 59, made applicable to bankruptcy proceedings by Fed.R.Bankr.P. 9023. *In re McCaull*, 2009 WL 9047528, *3 (10th Cir. Jan.26, 2009) (construing Debtor's motion to reconsider filed within the fourteen day period prescribed by Rule 9023 as a motion to alter or amend the judgment under Rule 59); *Buchanan v. Sherrill*, 51 F.3d 227, 230 n. 2 (10th Cir.1995) ("No matter how styled, we construe a post judgment motion filed within [14] days challenging the correctness of the judgment as a motion under Rule 59(e).").

▮ To be eligible for relief from a final judgment under Rule 59, the moving party must show: (1) an intervening change in the controlling law; (2) new evidence previously unavailable for the Court to consider; or (3) a need to correct clear error or prevent manifest injustice. *See Brumark Corp. v. Samson Resources Corp.*, 57 F.3d 941, 948 (10th Cir.1995). Reconsideration may also be warranted when "the court has obviously misapprehended a party's position on the facts or the law, or the court has mistakenly decided issues outside of those the parties presented for determination." *In re Sunflower Racing, Inc.*, 223 B.R. 222, 223 (D.Kan. 1998). However, Rule 59 does not afford parties seeking relief an opportunity to raise new arguments or to "rehash arguments previously considered and rejected by the court." *Id.*

The Motion for Reconsideration and Stay does not present any new arguments, law, or facts, but instead asks that the Court reconsider its ruling for the reasons explained in Hampton's previously filed brief.

The Court carefully considered Hampton's arguments before it issued the Memorandum Opinion and Order and concluded that they were not well taken. The Court is not inclined to reconsider those arguments now. The additional legal argument made by Hampton's counsel at the final hearing on the Motion for Reconsideration and Stay, while very well presented, did not add materially to the law the Court had already considered. The Court therefore finds that Hampton's request for reconsideration should be denied.

**B.** *The Motion for Stay Pending Appeal.*

▮ Federal Rule of Bankruptcy Procedure 8005 provides that a motion for stay pending appeal of a decision by a bankruptcy judge must first be made to the bankruptcy judge. Fed.R.Bankr.P. 8005. The purpose of a stay pending appeal is to preserve the status quo until the appeal is decided. *Tri–State Truck Ins., Ltd. v. First Nat'l Bank of Wamego*, 2011 WL 4553071, *1 (D.Kan.2011) (citing *McClendon v. City of Albuquerque*, 79 F.3d 1014, 1020 (10th Cir.1996)). In considering a motion for stay pending appeal, the Court considers the following four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987)).

The party seeking a stay pending appeal must satisfy all four factors to obtain a stay pending appeal. *See Moore v. Tangipahoa Parish School Bd.*, 2013 WL 141791, *20 (5th Cir. Jan.14, 2013); *In re Sunflower Racing, Inc.*, 225 B.R. 225, 227 (D.Kan. 1998). Factors one and two-likelihood of success [1] and irreparable harm—are the most critical. *Nken*, 556 U.S. at 434 (explaining that "[t]he first two factors of the traditional standard are the most critical.").

**1. *Whether Hampton Has Made a Showing it is Likely to Succeed on the Merits.*** This factor weighs against Hampton. As an unsuccessful bidder, Hampton may lack standing to challenge the Court's approval of the sale on appeal. *See, e.g., In re Broadmoor Place Investments, L.P.*, 994 F.2d 744, 746 n. 2 (10th Cir.1993) (noting that "absent some other meritorious ground for appeal ... an unsuccessful bidder and not an 'aggrieved person' " with standing to appeal an order approving a sale of assets); *Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 273 (2nd Cir.1997) (recognizing that, although not an absolute rule, "an unsuccessful bidder ... usually lacks standing to challenge a bankruptcy court's approval of a sale transaction.").[2] Given the number of circuit court decisions involving somewhat similar facts, Hampton could be found by an appellate court to come within an exception to the general rule. Nevertheless, the standing issue would present a serious procedural hurdle in any appeal, complicating the appeal and diminishing Hampton's chances of success.

Even if Hampton has standing, the Court is not convinced Hampton is likely to prevail. The Court carefully reviewed the testimony of the witnesses presented at the March 24, 2014 hearing, reviewed the parties' briefs, and conducted a thorough, independent review of the case law in this area. The Court believes it followed Tenth Circuit case law to the extent it gave guidance in the matter, and relied upon well-reasoned circuit court opinions from other circuits to fill in any gaps in current Tenth Circuit law.

Stripped to its essence, Hampton's position is that it wants to buy the Acquired Assets for almost $6 Million less than Golden Boy. Its sole ground for insisting on this result (which would be terrible from the estate's perspective) is that Golden Boy's offer arrived a day after the auction. Since the auction procedures

---

**1.** If the moving party establishes that the other three factors "tip decidedly in its favor," the "likelihood of success" factor for obtaining a stay pending appeal is "somewhat relaxed." *F.T.C. v. Mainstream Mktg. Services., Inc.*, 345 F.3d 850, 852 (10th Cir.2003); *F.T.C. v. Foster*, 2007 WL 3023158, at *1 (10th Cir.2007). Under the relaxed standard, the movant can satisfy the "likelihood of success" requirement by showing that "questions going to the merits [are] so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Mainstream Mktg.* at 853 (internal quotations omitted). Because the Court finds that Hampton has failed to demonstrate that most of the other factors tip in its favor, the Court need not apply this more relaxed standard to the likelihood of success requirement.

**2.** Potential bidders may have standing to object to a sale under § 363 if they were not given proper notice or if they challenge the intrinsic structure of the sale because of fraud, mistake, or unfairness. *See Colony Hill Associates*, 111 F.3d at 273 (potential bidders have standing to challenge sale where debtor fails to give proper notice of the sale); *In re Moran*, 566 F.3d 676, 681 (6th Cir.2009) (An exception to the general rule that frustrated bidders lack standing to object to a sale "may exist where [the] ... bidder challenges the intrinsic structure of the sale because it is tainted by fraud, mistake, or unfairness."). Those circumstances do not exist here.

specified from day one (a specification that Hampton never objected to) that any successful bid was conditioned on Court approval based on a finding of "highest or otherwise best value," it is not clear what position Hampton can legitimately pursue on appeal.

Of course the appellate courts could disagree with the Court's decision, but the Court finds that, at a minimum, it is more likely than not the decision will be upheld on appeal.

■ 2. *Whether Hampton Would Be Irreparably Injured Absent a Stay.* Hampton has a strong argument that it will be irreparably harmed. Given § 363(m), without a stay the Acquired Assets will soon be sold to Golden Boy, placing them out of Hampton's reach were it to succeed on appeal. Any appeal by Hampton therefore could become moot. *See e.g., In re C.W. Min. Co.,* 740 F.3d 548 (10th Cir. 2014) (discussing how appeals of § 363(m) orders may run into statutory and equitable mootness issues).

On the other hand, the asset purchase agreements signed by Hampton (and Ready Roast and Golden Boy) do not give buyers the right to purchase the Acquired Assets if the Trustee defaults. Instead, the agreements allow the Trustee to simply return the buyer's earnest money as their "sole and exclusive remedy." Thus, even if Hampton prevailed on appeal the Trustee would not be required to sell the property to Hampton, and Hampton would have no damages claim or claim for specific performance. This damages limitation provision undercuts to a significant degree Hampton's irreparable harm argument.

Notwithstanding Hampton's damages limitation problem, denying the stay request reduces Hampton's chances of owning the Acquired Assets if it were to prevail on appeal. The Court therefore finds that the factor addressing irreparable harm weighs in Hampton's favor.

■ 3. *Whether Issuance of the Stay Would Substantially Injure the Other Parties.* Granting a stay would substantially injure the Trustee, creditors, Golden Boy, and other parties in interest. An appeal could take years, during which time the Sunland peanut processing plant could sit idle, declining in value. The peanut inventory, with a value between $2 Million and $5 Million, would become worthless. Local farmers could rotate to other crops or find other buyers for their peanut production. Significant expenses would continue to accrue, including interest, insurance, pest and rodent control, and security expenses. By the time all appeals were exhausted, the value of the Acquired Assets could go from $25 Million to a fraction of that amount.

Hampton argues that there would be no significant loss of value because, if Golden Boy terminated its interest due to a stay,[3] Hampton would then purchase the Acquired Assets for $25,100,000 as the back-up bidder and pursue the appeal. This argument is entirely speculative; no one can know when or if Golden Boy would terminate the agreement, or what Hampton might or might not do if such a termination occurred. Further, the argument proposes a scenario that seems to turn the stay pending appeal from a shield into a sword. Finally, the loss to the Trustee would be $900,000 at a minimum, a significant sum.

Hampton also argued that the Court should enter a stay until at least April 24, 2014 to allow it to obtain emergency review of the Court's decision. The Court

---

**3.** The purchase agreement signed by the Trustee and Golden Boy provides that Golden Boy is obligated to close the transaction if closing can occur before April 24, 2014.

does not believe there is any realistic chance of obtaining appellate review that quickly. Further, in all likelihood the party losing before the district court (or bankruptcy appellate panel) would seek Tenth Circuit review. To be meaningful, any stay would have to be lengthy.

Overall, this factor weighs against Hampton.

■ 4. *Where the Public Interest Lies.* While there is a strong public interest in upholding the integrity of judicial sales,[4] there is also a strong public interest in paying creditors as much as possible in bankruptcy cases. Furthermore, in this case there is a strong public interest in completing a sale of the Acquired Assets as soon as possible, for the benefit of the area farmers, local vendors, and others in the Portales area. Sunland was a substantial economic presence in the Portales area and employed many area residents. Entry of a stay would prolong the economic suffering caused by Sunland's shut-down last August. On balance, the public interest strongly favors completing the sale immediately.

In summary, one factor favors Hampton and three factors favor the Trustee. Hampton's request for a stay must therefore be denied.

### C. *Leave for Interlocutory Appeal.*

Hampton asks for leave from this Court to file an interlocutory appeal. This request must be directed to the District Court or the Tenth Circuit Bankruptcy Appellate Panel. *See In re Gregory Rockhouse Ranch,* 2008 WL 394984 (Bankr. D.N.M.2008) (request for leave to appeal must be directed to the bankruptcy appellate panel); *In re Countrywide Home Loans, Inc.,* 387 B.R. 467, 470 (Bankr. W.D.Pa.2008) (same); *In re Frascella Enterprises, Inc.,* 388 B.R. 619 (Bankr. E.D.Pa.2008) (bankruptcy court forwarded motion for leave to file interlocutory appeal to the district court for ruling).

Furthermore, since the Court's order granting the Trustee's motion to approve the sale of the Acquired Assets to Golden Boy for $26,000,000 is a final, appealable order, the issues Hampton wishes to take up on appeal can be addressed in connection with that order.

### D. *Equitable Relief.*

Finally, Hampton seeks an award of $500,000, to be paid from of the proceeds of the sale of the Acquired Assets. In order to seek such relief, Hampton should file an application for administrative expense claim. The Court would adjudicate any such claim in the normal course of business, and takes no position at this time whether the application would have merit.

### III. *CONCLUSION*

As the request for reconsideration makes no new arguments, it will be denied. The request for leave to file an interlocutory appeal must be directed to the appellate court and will therefore be denied without prejudice. The request for an award of $500,000 is denied without prejudice to Hampton filing an application for administrative expense.

As to Hampton's request for a stay, if the Court could stay the sale of the Ac-

---

4. The Court does not believe the integrity of judicial sales was compromised in this case. The bidding procedures and sale order required Court approval of any sale, which was to be based on a finding that the proposed sale "will provide the highest or otherwise best value for the Acquired Assets and is in the best interests of the estate." Golden Boy's unexpected $25 Million upset bid, which was made in good faith, prevented the Court from making such a finding in connection with Hampton's $20,050,000 bid.

quired Assets without harming the estate, Golden Boy, creditors, or the public interest, it would seriously consider doing so, to preserve Hampton's right to an appeal. It is clear, however, that a stay, even of short duration, would significantly harm all interested parties, and possibly even harm Hampton as well, since the assets it bid on would decline in value. For this reason, and also because the Court does not believe Hampton is likely to succeed in any appeal, the Court cannot grant Hampton's request for a stay pending appeal.

A separate order will be entered consistent with this Memorandum Opinion.